United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 20, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 06-50368

Robert Jenevein,

Plaintiff-Appellant,

versus

Seana Willing, et al.,

Defendants-Appellees.

Appeal from the United States District Court
For the Western District of Texas, Austin Division

(Civil Docket No. 1:03-CV-499)

Before HIGGINBOTHAM, WIENER and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A state court judge in Texas filed suit against the Texas Commission on Judicial Conduct, under 42 U.S.C. § 1983. He argues that the Commission, in issuing an order of public censure, violated his First Amendment right of free speech. The district court upheld the censure, granting summary judgment in favor of the Commission. We affirm in part and reverse and remand in part.


I

On a Thursday morning, two days before Christmas, Judge Robert Jenevein was having breakfast with his wife, Terrie, at a Dallas restaurant. Stephen Stodghill, a local lawyer, interrupted them, explaining that he needed the assistance of a judge in a pending

matter.  Specifically, the lawyer requested an emergency hearing to consider his request to dissolve a temporary restraining order, which had been issued by Judge Leonard Hoffman the previous day —— the last day before the closing of the courthouse for the Christmas holidays.  Judge Hoffman was a visiting judge from Dallas County Court at Law No. 2, and had issued the t.r.o. in what has become known as "the Yahoo case."[1]  Stodghill was defense counsel.

Judge Jenevein told Stodghill to get Lawrence Friedman, the opposing counsel, and meet him at 1:00 p.m. at Dakota's restaurant, where Judge Jenevein had planned to have lunch with his wife.  When the parties arrived at Dakota's, there was a large group of people, contrary to Judge Jenevein's expectation of only the two attorneys.  To accommodate the group, they repaired to Stodghill's office, a few blocks away.  Following an impromptu hearing, Judge Jenevein granted the motion to dissolve the t.r.o.

After the Christmas break, the plaintiff in the Yahoo case moved to reinstate the t.r.o.  Defendants in the Yahoo case had filed an objection to Judge Hoffman's assignment, which automatically disqualified him under Texas law from continuing to preside over the case.  But Judge Hoffman, apparently believing he retained authority in the case, reinstated his earlier restraining order.

The Yahoo defendants then sought a writ of mandamus to

---

[1]The Yahoo case has enjoyed media attention.  *See, e.g.*, Glenna Whitley, The Pirate Attack on Yahoo, D Magazine, April 2001.

disqualify Judge Hoffman from further presiding in the case. The appellate court conditionally granted a writ of mandamus, voiding all orders signed by Judge Hoffman and prohibiting him from presiding over the case in the future.[2]

The case was then transferred to Judge Gibson, judge of Dallas County Court at Law No. 1. After the transfer, lawyer Friedman filed an affidavit prepared and signed by Jeffery Robnett, Judge Gibson's friend and former personal attorney. In the affidavit, Robnett claimed that Judge Gibson had solicited bribes from Stodghill and Mark Cuban, a defendant in the Yahoo case. Judge Gibson then recused in the Yahoo case on July 27, 2000, and that case was assigned to another judge. Robnett's allegation and Judge Gibson's subsequent recusal became the subject of significant press coverage.

The next morning, the plaintiff in the Yahoo case filed a fourth amended petition, in which the following was alleged:

> On information, ancillary to this matter but relevant to issues of pattern and pervasiveness of the type of conduct being complained of, Gibson has in other cases exchanged rulings for sexual favors, has made frequent ad litem appointments to Judge Robert Jenevein's wife and to [another lawyer] with his former firm, and with whom Gibson is alleged to have a more intimate relationship.

According to Judge Jenevein, all knew that this allegation was false and baseless, an abusive litigation tactic. There are five County Court at Law judges in Dallas County. Judge Gibson had

---

[2] In re Cuban, 24 S.W.3d 381, 384 (Tex. App. 2000).

already recused himself, and two of the remaining four judges recused because they owned stock in Yahoo. This left only two judges eligible to serve, one of whom was Judge Jenevein. Based on the December 23rd ruling, and his friendship with Judge Gibson, Judge Jenevein suspected that Friedman would not want him to preside over the Yahoo case.

Learning of the pleading, Judge Jenevein drafted a press statement responding to Friedman's pleading and had a court employee fax it to the local media. The court employee also notified local media that Judge Jenevein would be holding a press conference in his courtroom that afternoon at 4:00 p.m.

At the press conference, Judge Jenevein appeared in his judicial robes and, after moving from behind the bench, read the following statement, prepared earlier in the day:

> As you know, yesterday, Judge David Gibson recused himself from a case styled Universal Image, Inc., et al. v. Yahoo, Inc., et al. following some bizarre allegations that were the subject of an affidavit signed by Jeff Robnett and apparently tendered to one of the lawyers on the case while Mr. Robnett was representing Judge Gibson in a modification proceeding.

> The case now needs a new judge. The procedure allows for a new judge to be appointed, and the obvious choices are the remaining Dallas County Court at Law judges, of which I am one.

> I have already played a limited role in this case. I ordered that a wrongfully obtained restraining order be dissolved after holding a hearing on the matter. During that hearing, as I had anticipated, Mr. Larry Friedman moved to recuse me. That motion was denied on December 23, 1999, and the restraining order was then dissolved. On December 27, the following Monday, Mr. Friedman again [filed] a motion to recuse me from the case. That

4

motion, based in part on false representations to the court, was never heard. In that motion, Mr. Friedman [falsely] claimed that he had objected more than once to holding the hearing at the offices of opposing counsel and that I had repeatedly overruled that objection. There is a transcript of that hearing that speaks for itself. No such objection was ever asserted. If it had been, I would have sustained it.

Since then, Mr. Friedman has filed half a dozen or so other motions to recuse in this case alone, all of which I believe were filed solely for purposes of harassment and delay and to avoid any real consideration of the merits of the case. Then, today, he filed the <u>Plaintiff's Fourth Amended Original Petition</u> which contains, in my opinion, a clear attempt at judicial intimidation. Specifically, Mr. Friedman alleged that Judge Gibson — now a named defendant — "<u>has made frequent *ad litem* appointments to Judge Robert Jenevein's wife.</u>"

First, the reference is false unless 5 appointments in almost 20 months is fairly considered "frequent" in light of the hundreds of appointments made by Judge Gibson in that same time period.

Second, the allegation — if that's what it is — is spurious because there is nothing illegal, unethical or in any way improper about my wife serving as a guardian <u>ad litem</u> for minor children who have been injured.

Most disturbingly, the allegation [is] wholly irrelevant to the case in question. That is why I believe it is included in the pleading solely for purposes of judicial intimidation, a tactic we normally reserve for the mob. If I were not one of the judges to whom this case could have been assigned, I do not believe my wife would have been mentioned in the filings.

I realize with some regret that by withdrawing from any participation in the case, I may assist Mr. Friedman in accomplishing what I perceive to be his objective. It is disturbing to imagine that a lawyer can remove a judge from a case — whenever he thinks another judge might be more favorable — simply by making baseless and vicious allegations against the judge. It is, perhaps, a flaw in our system. I am encouraged, however, by the fact that I know of no other lawyers practicing in this County who

5

have the gall that I perceive Mr. Friedman to have.

To perfect the system[,] attorneys who perceive unethical conduct must act. It is true that all that must happen for evil to prevail is for good men to do nothing. I am very proud to be a judge. I am passionately committed [to] the principles for which this courtroom stands. That being the case[,] it is my intention to file a grievance against Mr. Friedman with the State Bar of Texas. As an adverse party to him in that proceeding, it would be inappropriate for me to preside over this case.

It is my fervent hope that I and the hundreds of attorneys and judges in this [C]ounty who share my views will soon stop what I perceive as abuses of the process and the criminal vilification of good lawyers and good judges in the interest of financial gain.

The press conference generated substantial news coverage. In the days following the press conference, Judge Jenevein received approximately 100 inquiries from friends and colleagues. In response, Judge Jenevein sent an email to approximately 76 friends, family members, and colleagues[3] — which included fellow attorneys and judges — regarding the news coverage. It read:

Many of you have asked me why I was on the evening news about 10 days ago. Thank you for your concern and your support. What follows is an explanation I hope you will feel free to share with anyone [you] wish.

I was on the news as a result of having removed myself as a judge to whom a particular lawsuit could have been assigned. I decided to remove myself immediately when I learned of references to both me and my wife in the 4th amended petition filed by the Plaintiff's attorney in that case. I felt the references were so highly inappropriate that drastic and immediate action was required on my part. On Friday, July 28, I announced that I would take that action and that, as a result, it would be inappropriate for me to preside over the case.

---

[3] In his brief, Judge Jenevein states that the email was sent to 79 people.

6

> That's it.
>
> To this day, I know of no specific accusations of misconduct on my part despite a few oblique references in the media to the contrary. Channel 8 reported that a "formal complaint" had been filed against me, but nothing has been filed with the Dallas County DA, the Judicial Conduct Commission or the State Bar. The FBI will not confirm or deny whether any reports have been filed with them.
>
> Finally, I believe my relationship with a particular Dallas attorney has become adversarial. I expect that he may file a complaint if he determines it may force me to pay a political price, regardless of whether the complaint has any merit.
>
> I am happy to answer what questions I can. My office number is . . . . Home is . . . .

The email was sent at approximately 2:30 p.m. from Judge Jenevein's computer at the County Court of Law No. 3.

After the press conference and email, Friedman filed a grievance against Judge Jenevein with the State Commission on Judicial Conduct. On Friedman's complaint, the Commission initiated formal proceedings against Judge Jenevein, asserting four charges against him, but dismissing two of the charges soon thereafter. Of the two surviving charges, the Commission first charged that Judge Jenevein's decision to hold a press conference, while wearing his judicial robes, for the purpose of expressing his personal feelings and criticisms about Friedman's conduct violated (1) Article V, Section 1-a(6) of the Texas Constitution, (2) Canon 2B of the Texas Code of Judicial Conduct ("TCJC"), (3) Canon 3B(2) of the TCJC, (4) Canon 3B(4) of the TCJC, and (5) Canon 4A(1) of the TCJC. The second charge specified that Judge Jenevein's

7

decision to send an unsolicited communication discussing the Yahoo case during normal business hours violated (1) Article V, Section 1-a(6) of the Texas Constitution, (2) Canon 2A of the TCJC, (3) Canon 2B of the TCJC, and (4) Canon 3B(2) of the TCJC.

During the course of the disciplinary proceedings, Judge Jenevein moved to dismiss both charges, arguing that his statements were protected by the First Amendment. At a hearing on August 26, 2002, the Commission determined that it could not rule on the constitutional issue prior to a formal hearing. On September 24, 2002, a special master held a formal hearing on the charges, but declined to rule on the constitutional issue, recommending that the issue be addressed by the Commission.

The Commission subsequently held a hearing on the objections to the recommendations of the special master. On January 21, 2003, without addressing the constitutional issue, the Commission entered an Order of Public Censure against Judge Jenevein.[4] As to Charge 1, the Commission concluded that "Jenevein's actions on July 28, 2000, during the court's normal business hours, in holding a press conference in his courtroom, while wearing his judicial robe, in order to read a prepared statement concerning the Yahoo Case and his personal feelings and criticisms about the conduct of Freidman [sic] and his clients in connection with that still-pending Case"

---

[4] The Order was signed and dated January 17, 2003.

violated Article 5, Section 1-a(6)A of the Texas Constitution[5] and Canon 2B of the TCJC.[6]  As to Charge 2, the Commission concluded that "Jenevein's actions on August 8, 2000, during the court's normal business hours, in using the county computer system to send the unsolicited communication to approximately seventy-six (76) family members, friends, lawyers, and judges, in order to further discuss the Yahoo case, Friedman, and the July 28th press conference" violated Article 5, Section 1-a(6)A of the Texas Constitution and Canon 2B of the TCJC.[7]

Judge Jenevein attempted to appeal the censure order, requesting the Chief Justice of the Texas Supreme Court to appoint a special court of review, and he did, selecting three Texas state appellate judges.  This special court of review  held a hearing in

_____

[5] Article V, section 1-a(6)A provides that any Texas justice or judge may be removed from office, disciplined, or censured for:

> willful or persistent violation of rules promulgated by the Supreme Court of Texas, incompetence in performing the duties of the office, willful violation of the Code of Judicial Conduct, or willful or persistent conduct that is clearly inconsistent with the proper performance of his duties or casts public discredit upon the judiciary or on the administration of justice.

The Commission concluded that Judge Jenevein violated this Article because his actions were a willful violation of the TCJC — specifically, Canon 2B — and were inconsistent with the proper performance of his duties.

[6] Canon 2B provides:
"<u>A judge shall not allow any relationship to influence judicial conduct or judgment.  A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others</u>; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge.  A judge shall not testify voluntarily as a character witness."  (emphasis added).

[7] The Commission concluded that Judge Jenevein violated the same portion of Canon 2B in Charge 2 as he violated in Charge 1.

April but on June 12, 2003 announced that it lacked jurisdiction to hear an appeal from the Commission and dismissed Judge Jenevein's appeal.

Following the dismissal of his disciplinary appeal, Judge Jenevein filed a § 1983 lawsuit in the United States District Court against the members of the Commission in their official capacity. In his complaint, Judge Jenevein set forth two claims. First, he asserted that the Commission violated his First Amendment rights, because his comments were protected speech for which he could not be disciplined. Second, he claimed that the Commission violated his due-process rights, because it failed to (1) provide him notice of the penalties it was seeking, (2) allow him to ask witnesses what they told the Commission's investigators, (3) consider the sufficiency of his constitutional challenges, except at a full hearing before the Commission, and (4) afford him any meaningful appellate review. Based on these claims, Judge Jenevein requested the district court to order the Commission to expunge the censure order and to award him attorney's fees incurred in defending the disciplinary proceeding and in prosecuting the § 1983 suit.

After two Rule 12 motions to dismiss and the filing of an amended complaint, Judge Jenevein's claim for attorney's fees was dismissed, but his two constitutional claims remained. After the Rule 12 orders were entered, the Commission filed an answer and then a motion for summary judgment, arguing that both of Judge Jenevein's constitutional claims should be dismissed.

The district court referred the summary judgment motion to the magistrate judge for a report and recommendation. The magistrate judge recommended that the motion for summary judgment be granted, because (1) Judge Jenevein's speech was predominantly a matter of private concern and, to whatever extent Judge Jenevein had a protected interest, it was outweighed by the State's interest in protecting the efficiency and impartiality of the state judicial system; and (2) Judge Jenevein failed to establish that he was denied due process. The district court approved and accepted the magistrate judge's report and recommendation, granting the Commission's motion for summary judgment.

In its summary judgment motion, the Commission also contended that the censure order was not based on Judge Jenevein's speech, but instead on his actions — the use of taxpayer-funded facilities to aid his and his wife's interests. The district court found this argument to be unpersuasive, concluding that Judge Jenevein was censured for both his speech and his actions. Judge Jenevein filed timely a notice of appeal.

II

Judge Jenevein contends that the district court erred in concluding that his speech was a matter of private concern and that his First Amendment rights were outweighed by the State's interests. He does not challenge the district court's dismissal of his due-process claim or his claim for attorney's fees. The Commission supports the district court's rulings, and argues

11

alternatively that Judge Jenevein has no First Amendment claim because the Commission disciplined him based on his actions, not his speech.

A

We review the district court's grant of summary judgment de novo, applying the same standards as the district court.[8] The parties hang their arguments on employee-speech doctrine, applying this court's content-form-context balancing test. Although this approach summons informing principles of free speech of employees, their categorical divisions of public and private speech fail to illuminate the state's interest in constraining speech by an elected public official, political speech at the core of the First Amendment, and its necessity.[9] Our "employee" is an elected official, about whom the public is obliged to inform itself, and the "employer" is the public itself, at least in the practical sense, with the power to hire and fire. It is true that Judge Jenevein was an employee of the state. It is equally true that as an elected holder of state office, his relationship with his employer differs from that of an ordinary state employee. It is also the case that "[i]f the State chooses to tap the energy and the legitimizing power of the democratic process [in the election of judges], it must accord the participants in that process . . .

---

[8] Branton v. City of Dallas, 272 F.3d 730, 739 (5th Cir. 2001).

[9] See Republican Party of Minn. v. White, 536 U.S. 765 (2002)

12

the First Amendment rights that attach to their roles."[10]  We are persuaded that the preferable course ought not draw directly upon the *Pickering-Garcetti* line of cases for sorting the free speech rights of employees elected to state office.[11]  Rather, we turn to strict scrutiny of the government's regulation of the elected official's speech to his constituency, requiring such regulations to be narrowly tailored to address a compelling government interest, a question to which we now turn.[12]

B

The government's asserted interest is "in protecting the efficiency and impartiality of the state judicial system."[13]  The Commission urges that allowing a judge to spend working hours on personal issues, and to use his judicial position to influence his personal agenda harms the efficient administration of justice and the public's perception of the judiciary.

In *Flowers*, this court balanced the First Amendment rights of an elected justice of the peace against the interests of the State of Texas in "protecting the efficiency and impartiality of the

---

[10] Id. at 788.

[11] Pickering v. Bd. of Educ. of Township High Sch. Dist., 391 U.S. 563 (1968); Garcetti v. Ceballos, 126 S. Ct. 1951 (2006).

[12] See Republican Party of Minn., 536 U.S. at 774–75 (applying strict scrutiny in a First Amendment challenge to judicial cannons of ethics); see also Stretton v. Disciplinary Bd. Of the Supreme Court of Pa., 944 F.2d 137, 142 (3d Cir. 1991) (same).

[13] Scott v. Flowers, 910 F.2d 201, 212 (5th Cir. 1990).

state judicial system."[14]  In that case, the plaintiff, an elected county justice of the peace, wrote an open letter to county officials, circulating it to the local press, and prompting articles attacking the district attorney's office and the county court-at-law for dismissing numerous traffic ticket appeals and calling on the county officials to remedy the problem.[15]  In the letter, the judge added that, if the county officials refused to intercede, the public should at least be made aware of this practice.[16]  The Commission reprimanded the judge, advised him "to be more restrained and temperate in written and oral communications in the future."[17]

In evaluating the parties' respective interests, we began by explaining that the State's interest in suppressing the judge's speech was "much weaker than in the typical public employee situation," because he was "an elected official, chosen directly by the voters of his justice precinct, and, at least in ordinary circumstances, removable only by them."[18]  Notwithstanding these weakened interests, the court went on to hold that the State does have a legitimate interest "in protecting the efficiency and impartiality of the state judicial system," but that, as the

---

[14] Id.

[15] Id. at 204.

[16] Id.

[17] Id. at 205 n.6.

[18] Id. at 211-12.

14

reprimand infringed on the plaintiff's right "'to make statements . . . on public issues outside a campaign context'" and thus touched on "'core first amendment values,'" the Commission carried a "very difficult burden."[19] In evaluating the interests of the State, the court concluded that the Commission failed to carry its burden, as it was unable to explain precisely how the judge's criticisms would impede the goals of promoting an efficient and impartial judiciary.[20] Instead, the court found that the State's interests would be "ill served by casting a cloak of secrecy around the operations of the courts, and that by bringing to light an alleged unfairness in the judicial system, [the plaintiff] in fact furthered the very goals that the Commission wishes to promote."[21]

We agree that the state has a compelling interest in protecting the integrity of its judiciary.[22] In *Republican Party of Minnesota*, Justice Scalia, writing for the court, stopped short of finding a compelling interest in an "impartial" judiciary, explaining that "impartiality" may be defined several ways, some of which do not raise compelling state interests, and others of which the State of Minnesota did not have in mind. The Court's opinion

---

[19] Id. at 212 (quoting Morial v. Judiciary Comm'n of La., 565 F.2d 295, 301 (5th Cir. 1977) (en banc)).

[20] Id. at 213.

[21] Id.

[22] Randall T. Shepard, *Campaign Speech: Restraint and Liberty in Judicial Ethics*, 9 Geo. J. Legal Ethics 1059 (1996).

15

rested instead on the holding that whatever Minnesota's ill-defined interest, the judicial cannon of ethics was not narrowly tailored to meet it. Justice Kennedy, who provided the fifth vote with a concurring opinion, stating that "[n]othing in the Court's opinion should be read to cast doubt on the vital importance of [the integrity of the judiciary]."[23] He concluded that "[t]he power and the prerogative of a court" rests "upon the respect accorded its judgments," and that "[j]udicial integrity is, in consequence, a state interest of the highest order."[24]

An impartial judiciary, while a protean term, translates here as the state's interest in achieving a courtroom that at least on entry of its robed judge becomes a neutral and disinterested temple, in appearance and fact — an institution of integrity, the essential and cementing force of the rule of law. That this interest is compelling cannot be gainsaid. We turn to the more difficult question of whether the censure order of the commission was narrowly tailored to meet these state interests.

The Commission censured Judge Jenevein for his "actions on July 28, 2000, during the court's normal business hours, in holding a press conference in his courtroom, while wearing his judicial robe, in order to read a prepared statement concerning the Yahoo Case and his personal feelings and criticisms about the conduct of

---

[23] Republican Party of Minn., 536 U.S. at 793.

[24] Id.

Freidman [sic] and his clients in connection with that still-pending Case." The Commission contends that its censure order advances its interests because when a judge speaks publicly against a lawyer's conduct, it leads the public to believe that the judge is vindictive and biased. The Commission urges that Judge Jenevein's speech could cause the public to "question Judge Jenevein's temperament and his ability to adequately ignore criticism and not let it interfere with his rulings — regardless of whether such criticism was well founded," an argument that sorely tests the state's contention that its censure here was not content based.

Perhaps the Commission is correct that the public could perceive that Judge Jenevein might visit on a party the judge's perception that his counsel was "unethical" or "evil." Judge Jenevein's response was that he planned to file a grievance against Friedman and recuse himself from this case, indisputably proper judicial responses, clouding any public perception that he would personally retaliate against Friedman or other persons engaged in conduct thought improper. Such invocations of the "appearance of impropriety" seductively take the state into content-based regulation of political speech.

To leave judges speechless, throttled for publically addressing abuse of the judicial process by practicing lawyers, ill serves the laudable goal of promoting judicial efficiency and impartiality. It signifies that Texas has persisted in electing

17

its judges, a decision which, for good or ill, casts judges into the political arena. There is more.  The Court has refused to accept contentions that these elected judges are not subject to the Voting Rights Act, holding that they are political actors.[25]  And the Court has cautioned that "[t]he greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance."[26] And in vindication of the First Amendment, as a holder of an official office the judge loses the full protection of his reputation afforded by state laws of libel and slander — leaving little more than self-help in the marketplace of ideas or Job-like silence.

To the extent that the commission censured Judge Jenevein for the content of his speech, shutting down all communication between the Judge and his constituents, we reverse and remand with instructions to expunge that part of the order.  Like the Supreme Court in *Republican Party of Minnesota*, we hold that the Commission's application of this cannon to Judge Jenevein is not narrowly tailored to its interests in preserving the public's faith in the judiciary and litigants' rights to a fair hearing.  Indeed,

---

[25]*League of United Latin American Citizens Council No. 4434 v. Clements*, 914 F.2d 620, 637 (5th Cir. 1990) (en banc) reversed sub nom. *Houston Lawyers' Ass'n v. Attorney General*, 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991); *League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 838 (5th Cir. 1993) (en banc); *see also Chisom v. Edwards*, 839 F.2d 1056 (5th Cir.), cert. denied sub nom. *Roemer v. Chisom*, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988).

[26]Republican Party of Minn., 536 U.S. at 788 (quoting Renne v. Geary, 501 U.S. 312, 349 (1991).

18

in a sense the censure order works against these goals.  For although Judge Jenevein's speech concerned a then-pending matter in another court, it was also a matter of judicial administration, not the merits of a pending or future case.  He was speaking against allegations of judicial corruption and allegations of infidelity against his wife made for tactical advantage in litigation, concluding with a call to arms, urging his fellow attorneys and judges to stand up against unethical conduct. The Commission's stated interests are not advanced by shutting down completely such speech.  To the point, the narrow tailoring of strict scrutiny is not met by deploying an elusive and overly-broad interest in avoiding the "appearance of impropriety."

That said, the censure order survives strict scrutiny to the extent that it is directed at Judge Jenevein's use of the trappings of judicial office to boost his message, his decision to hold a press conference in his courtroom, and particularly stepping out from behind the bench, while wearing his judicial robe, to address the cameras.  The state has a compelling  interest in preserving the integrity of the courtroom, and judicial use of the robe, which symbolically sets aside the judge's individuality and passions. And while these interests cannot be met by broadly censuring the content of speech the commission finds offensive, they can be met with lesser if not minimal impact on the message: by accepting as we must that elected judges are political actors, but insisting that judges take it outside.  At oral argument, the Commission

19

stated that its motivating concern for the censure order was not Judge Jenevein's message, but his use of the courtroom and the robe, conceding that if Judge Jenevein had held the press conference a block away at the Adolphus Hotel, without his robe, it would have withheld censure. We hold that it is within the Commission's power to censure Judge Jenevein for wielding state electronic equipment and choosing to don his robe and conduct his press conference in the courtroom, instead of walking to a public forum a block away. We do not suggest that the separation of office from office-holder is always easily accomplished. While holding office the judge is always a judge; indeed he seeks re-election as an incumbent judge. It does not follow that the state's interests in preserving the judicial temple is not compelling or that the state's interests lose their compelling force in the political arena. Today we say only that the state can put the courtroom aside.

III

The Commission argues alternatively that Judge Jenevein has no viable First Amendment claim because his action, not his speech, was the substantial or motivating factor in the censure, a question that we review for clear error.[27]

The Commission contends that the district court erred in concluding that the Commission disciplined Judge Jenevein based on

---

[27] Lukan v. North Forest ISD, 183 F.3d 342, 346 (5th Cir. 1999).

his speech and not merely his actions. In ruling on the Commission's second motion to dismiss and motion for summary judgment, the district court adopted the magistrate judge's recommendation and reports. In these recommendation and reports, the magistrate judge, considering the language of the censure order, concluded that the censure order was based on both Judge Jenevein's actions in using court resources to facilitate his speech and the content of his speech. Accordingly, the magistrate judge recommended that Judge Jenevein had sufficiently alleged a cause of action.

The Commission argues that, based on the language from the censure order as well as the Canon that Judge Jenevein was found to have violated, it censured Judge Jenevein solely because of his actions and not because of his speech. In the censure order, the Commission disciplined Judge Jenevein for his (1) "actions on July 28, 2000, during the court's normal business hours, in holding a press conference in his courtroom, while wearing his judicial robe, in order to read a prepared statement concerning the Yahoo Case and his personal feelings and criticisms about the conduct of Freidman [sic] and his clients in connection with that still-pending Case;" and (2) "actions on August 8, 2000, during the court's normal business hours, in using the county computer system to send the unsolicited communication to approximately seventy-six (76) family members, friends, lawyers, and judges, in order to further discuss the Yahoo case, Friedman, and the July 28th press conference." The

Commission argues that the gist of the censure order was Judge Jenevein's use of taxpayer-funded property and the trappings of his office to advance his and his wife's private interests, not the opinions he expressed about the Yahoo case or Friedman. The Commission asserts that its censure order made no reference to the content of Judge Jenevein's speech, but only to his "actions."

In addition, the Commission points out that it cited Canon 2(B) as the basis of the censure. Canon 2(B), in pertinent part, provides that "[a] judge shall not allow any relationship to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others." The Commission offers that, if it had intended to punish Judge Jenevein's speech, it would have relied on Canon 3(B)(10), which mandates that "[a] judge shall abstain from public comment about a pending or impending proceeding which may come before the judge's court in a manner which suggests to a reasonable person the judge's probable decision on any particular case."

Though the space between speech and action is notoriously foggy, the speech rights here cannot be cabined by the Commission's citation practices, or by its use of the word "actions" instead of the word "speech." The Commission's order, while doubtlessly entered in good faith effort to pursue the public interest, is concerned with the content of Judge Jenevein's speech, censuring his use of County resources "in order to read a prepared statement concerning the Yahoo Case and his personal feelings and criticisms

22

about the conduct of Freidman [sic] and his clients in connection with that still-pending Case" and "in order to further discuss the Yahoo case, Friedman, and the July 28th press conference." The Commission's order references "actions" for censure only because of their communicative impact, explaining that Judge Jenevein "[held] a press conference in his courtroom, while wearing his judicial robe."

We are not persuaded that the commission would have blinked at either of these acts but for the content of Judge Jenevein's speech and its delivery by the judge in his courtroom in his robe and carried forward in electronic messages from the court. We find no genuine issue of material fact as to whether the censure order was directed, in part, at the content of Judge Jenevein's speech. Nor can we conclude that the Commission's censure order was simply a time, place, and manner restriction preventing a judge during court hours from drafting a press statement, holding a press conference, or drafting an email. Rather we conclude that the state interest we have described meets the test of compelling necessity.

IV

The judgment of the district court is AFFIRMED in part and REVERSED and REMANDED in part with instructions to enter judgment for the plaintiff, ordering the Texas Commission on Judicial Conduct to expunge the censure order to the extent that it reached beyond Judge Jenevein's use of the courtroom and his robe to send

23

his message.