REVISED April 27, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 24, 2009

Charles R. Fulbruge III
Clerk

No. 06-51587

AVINASH RANGRA; ANNA MONCLOVA

Plaintiffs-Appellants

v.

FRANK D. BROWN, District Attorney; GREGG ABBOTT, Texas Attorney
General

Defendants-Appellees

Appeal from the United States District Court
for the Western District of Texas

Before WIENER, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The pivotal question presented by this appeal is whether speech of elected
state and local government officials made pursuant to their official duties, like
speech of non-elected public employees, is less protected by the First Amendment
than other speech. The district court held that the First Amendment affords
absolutely no protection to speech by elected officials made pursuant to their
official duties. We disagree. The First Amendment's protection of elected
officials' speech is full, robust, and analogous to that afforded citizens in general.
Furthermore, when a state seeks to restrict the speech of an elected official on

the basis of its content, a federal court must apply strict scrutiny and declare that limitation invalid unless the state carries its burden to prove both that the regulation furthers a compelling state interest and that it is narrowly tailored to serve that interest. In the present case, because the district court dismissed the elected officials' challenge to a state statute that regulates their speech on the basis of its content without applying the required strict scrutiny analysis, we reverse the district court's judgment and remand the case for the performance of that task.

I.

The plaintiffs, elected city council members, were indicted in state court for violations of the criminal provisions of the Texas Open Meetings Act ("TOMA")[1] by acting as a quorum in exchanging private emails discussing whether to call a council meeting to consider a public contract matter. After prosecuting the charges for several months, the district attorney dismissed them without prejudice. The plaintiffs, alleging fear of future prosecutions and undue restriction of their First Amendment speech rights, brought this § 1983 action in federal district court for declaratory and injunctive relief against the state attorney general and the district attorney, challenging as content-based speech regulations the criminal provisions of TOMA. The district court dismissed the plaintiffs' claims, holding that under Garcetti v. Ceballos, 547 U.S. 410 (2006), elected officials, like public employees, enjoy no First Amendment protection of their speech made pursuant to their official duties. The plaintiffs appealed and we now reverse and remand the case to the district court for further proceedings.

---

[1] TEX. GOV'T CODE ANN. § 551.001 et seq. (Vernon 2007).

II.

Defendants assert that this case is nonjusticiable because the plaintiffs lack standing and their claims are moot. We agree with the district court that the plaintiff Mr. Rangra has standing, and we conclude that the case is not moot.[2]

To establish standing, the plaintiff must demonstrate injury, causation, and redressability. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). It is well established that a credible threat of present or future criminal prosecution will confer standing. See, e.g., Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 392-93 (1988) (holding that the injury-in-fact requirement was met, in part, because "plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them"); Steffel v. Thompson, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a party] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); Doe v. Bolton, 410 U.S. 179, 188-89 (1973). This is because a credible threat of present or future prosecution is an injury sufficient to confer standing, even if there is no history of past enforcement, see Bolton, 410 U.S. at 188, and a speaker who fears prosecution may engage in self-censorship, which is itself another injury, see Am. Booksellers, 484 U.S. at 392 ("[T]he alleged danger of [the challenged] statute is,

---

[2] The record reflects that Mr. Rangra is still a member of the city council, although Ms. Monclova may not be. A case is not moot as long as a live controversy exists between at least one plaintiff and one defendant. See Cutter v. Wilkinson, 544 U.S. 709, 712 n.1 (2005); 13B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3533.1 n.18 (3d ed. 2008). Consequently, we need not address standing with respect to Ms. Monclova. To the extent the issue remains open, we leave its consideration and determination to the district court on remand.

in large measure, one of self-censorship."); see also Ashcroft v. ACLU, 542 U.S. 656, 670-71 (2004) ("Where a prosecution is a likely possibility . . . speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech.").

"The standard – encapsulated in the phrase 'credible threat of prosecution' – is quite forgiving."[3]  "[W]hen dealing with . . . statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."[4]

The district court held that the plaintiff established standing by demonstrating injury in fact, causation, and redressability through self-censorship out of fear of prosecution under TOMA.[5] We agree. The plaintiff's affidavits and trial testimony show that he has self-censored his speech to avoid prosecution under TOMA[6] and thereby established injury.[7] Moreover, the

---

[3] N. H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 14 (1st Cir. 1996) (citing Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 301 (1979)).

[4] Gardner, 99 F.3d at 15 (citing Babbitt, 442 U.S. at 301-02; Bolton, 410 U.S. at 188; Am. Booksellers, 484 U.S. at 392-93; Chamber of Commerce of U.S. v. FEC, 69 F.3d 600, 603-04 (D.C. Cir. 1995); Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)).

[5] See Rangra v. Brown, No. P-05-CV-075, 2006 WL 3327634, at *4 (W.D. Tex. Nov. 7, 2006); see also Ctr. for Individual Freedom v. Carmouche, 449 F.3d 655, 659 (5th Cir. 2006).

[6] For example, Rangra's affidavit states the following:

I am still a member of the Alpine City Council. I still want to talk to and discuss public matters with my fellow elected city council members. I would like to communicate with city councilors, and the public, by email, regular mail, telephone, and directly. Because of Mr. Brown's prosecution of me and my fellow councilors, I am afraid to do this. I am afraid to exercise my First Amendment rights to communicate with my fellow councilors, and the public. I am afraid that if I talk to anyone about public matters, except at a city council meeting, I could be indicted and face a criminal prosecution. This threat to me is ongoing and real. But for this threat, I would exercise my First Amendment

plaintiff has alleged threats of prosecution that cannot be characterized as "imaginary or speculative." See Steffel, 415 U.S. at 459. He has been indicted and prosecuted for his email discussion of setting up a city council meeting pertaining to council business, and the Texas Attorney General has warned that the speech the plaintiff claims is constitutionally protected and for which he has been indicted, viz., communications, including emails, discussing public business or public policy, is subject to future prosecution.[8] The prosecution of the plaintiff for his email communications is ample demonstration that his concern with future indictment and prosecution is not "chimerical." See id. (citing Poe v. Ullman, 367 U.S. 497, 508 (1961)). In these circumstances, it is not necessary that the plaintiff first expose himself to actual arrest, indictment, or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights. See id. (citing Epperson v. Arkansas, 393 U.S. 97 (1968)).

Because the reasons for the plaintiff's standing continue to exist, we also reject defendants' argument that the case is moot.[9]

---

rights to communicate with the voters and public officials.

[7] See, e.g, Am. Booksellers, 484 U.S. at 392; Ashcroft v. ACLU, 542 U.S. at 670-71.

[8] See, e.g., Op. Tex. Att'y Gen. JC-0307 (2000).

[9] To avoid mootness "[t]he requisite personal interest that must exist at the commencement of the litigation [to give rise to standing] must continue throughout its existence," i.e., the controversy underlying the lawsuit must persist. Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (quoting U. S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)).

III.

The plaintiffs challenge the criminal provisions of TOMA as state regulations imposing an invalid content-based restriction of free speech.[10] The Supreme Court has held that the strict scrutiny test governs challenges for assessing laws that regulate speech on the basis of its content.[11]

Strict scrutiny, a formula crafted by the Supreme Court for implementing constitutional values, is one of the most important elements of modern constitutional law.[12] Strict scrutiny varies from ordinary scrutiny by imposing three hurdles on the government. It shifts the burden of proof to the government, requires the government to prove that its action or regulation pursues a compelling state interest, and demands that the government prove

---

[10] "As a matter of constitutional tradition, in the absence of evidence to the contrary, we presume that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." Reno v. ACLU, 521 U.S. 844, 885 (1997). Accordingly, content-based speech restrictions are presumed invalid because "[a]ny restriction on expressive activity because of its content would completely undercut the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" Police Dep't of Chicago v. Mosley, 408 U.S. 92, 96 (1972) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)); see also Turner Broad. Sys. v. FCC, 512 U.S. 622, 641 (1994) ("At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal. Government action that stifles speech on account of its message . . . contravenes this essential right." (citations omitted)); Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n., 447 U.S. 530, 538 (1980) ("To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth.").

[11] See, e.g., Republican Party of Minn. v. White, 536 U.S. 765, 774-75 (2002); United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813-814 (2000); Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 118 (1991); Sable Commc'ns of Cal., Inc. v. FCC, 492 U.S. 115, 126 (1989)

[12] See Richard H. Fallon, Jr., Strict Judicial Scrutiny, 54 UCLA L. REV. 1267, 1268-69 (2007); Stephen A. Siegel, The Origin of the Compelling State Interest Test and Strict Scrutiny, 48 AM. J. LEGAL HIST. 355, 355 (2006).

that its action or regulation is "narrowly tailored" to further that compelling interest.[13]

We agree with the plaintiffs that the criminal provisions of TOMA are content-based regulations of speech that require the state to satisfy the strict-scrutiny test in order to uphold them.[14] A speech regulation is content-based if it defines the regulated speech by reference to its content.[15] For example, in

---

[13] See Siegel, supra note 12, at 360 (citing ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 645, 767, 902-903 (2d ed. 2002)); Fallon, supra note 12, at 1273.

[14] See, Ashcroft v. ACLU, 542 U.S. at 665 ("When plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute."); White, 536 U.S. at 774 (applying strict scrutiny to a law prohibiting speech on the basis of its content); Playboy, 529 U.S. at 813 ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest"); Reno, 521 U.S. at 868 (applying "the most stringent review" to a content-based restriction); Turner Broad., 512 U.S. at 642 ("Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content"); Burson v. Freeman, 504 U.S. 191, 198 (1992) (holding that "a facially content-based restriction on political speech . . . must be subjected to exacting scrutiny: The State must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end" (internal quotation marks omitted)); R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid"); Simon & Schuster, 502 U.S. at 116 ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." (internal quotation marks omitted)); Boos v. Barry, 485 U.S. 312, 321 (1988) ("Our cases indicate that as a content-based restriction on political speech in a public forum, [the statute prohibiting negative picketing] must be subjected to the most exacting scrutiny."); Carey v. Brown, 447 U.S. 455, 461-62 (1980) (applying strict scrutiny to a content-based restriction); Mosley, 408 U.S. at 95 ("[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content").

[15] See Playboy, 529 U.S. at 811 ("[When] speech . . . is defined by its content . . . the statute which seeks to restrict it is content based."); see also White, 536 U.S. at 774 (holding a statute burdening a category of speech, "speech about the qualifications of candidates for public office," to be content-based); Reno, 521 U.S. at 868 (holding that a law prohibiting transmission of indecent material by means of a telecommunications device to a minor was a content-based restriction); Burson, 504 U.S. at 197 ("Whether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a

Burson v. Freeman, 504 U.S. 191, 196 (1992), the Court found a statute prohibiting display of political campaign materials within 100 feet of a polling place to be a content-based speech restriction because "[w]hether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a political campaign. The statute does not reach other categories of speech, such as commercial solicitation, distribution, and display." Id. at 197. TOMA § 551.144, which criminalizes the discussion of public matters by a quorum of public officials when outside of an open meeting, see Tex. Gov't Code Ann. §§ 551.001, 551.144(a), is similarly content based because whether a quorum of public officials may communicate with each other outside of an open meeting depends on whether the content of their speech refers to "public business or public policy over which the governmental body has supervision or control."[16]

Furthermore, because TOMA imposes a content-based regulation, we conclude that the district court was required to apply the strict-scrutiny test and to make the state carry its burden of proving that the statute pursues a compelling interest which the law is narrowly tailored to further. The district court did not perform that task because it mistakenly concluded that elected officials' speech made pursuant to their official duties is totally unprotected by the First Amendment. For this reason, the district court dismissed the plaintiffs'

---

political campaign. The statute does not reach other categories of speech, such as commercial solicitation, distribution, and display. This Court has held that the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic"); Boos, 485 U.S. at 321 (holding that a prohibition on picket signs critical of a foreign government was content based).

[16] TEX. GOV'T CODE ANN. § 551.001 (Vernon 2007).

claims as not actionable without ever undertaking the strict-scrutiny analysis. Consequently, we must vacate the district court's judgment and remand the case to it for a proper application of the strict scrutiny test. Before doing so, however, we will explain why the district court erred in assuming that the speech of elected officials made pursuant to their official duties is entitled to no protection under the First Amendment.

## IV.

The Supreme Court, in Garcetti, held that the First Amendment does not protect a government employee from discipline based on speech made pursuant to the employee's official duties.[17] The district court assumed that there is no meaningful distinction between the speech of elected officials and that of public employees and held that, under Garcetti, the plaintiffs' speech pursuant to their official duties was not protected by the First Amendment.

The district court's premise that the First Amendment's protection of elected officials' speech is limited just as it is for the speech of public employees, however, is incorrect. Job-related speech by public employees is clearly less protected than other speech because the Court has held that government employees' speech rights must be balanced with the government's need to supervise and discipline subordinates for efficient operations.[18] The First

---

[17] See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).

[18] In Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), the Court stated that its task was to balance the free speech rights of government employees with the government's "interest . . . as an employer, in promoting the efficiency of the public services it performs through its employees." Id. "[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id.

9

Amendment does not protect government employees' job-related speech unless the speech is about a matter of public concern, "and even then, a government employee may be fired or disciplined for her speech if the government employer can show, on balance, that the efficient operation of the office justified the action."[19] But when the state acts as a sovereign, rather than as an employer, its power to limit First Amendment freedoms is much more attenuated.[20] That is because a state's interest in regulating speech as sovereign is "relatively subordinate . . . [as] [t]he government cannot restrict the speech of the public at large just in the name of efficiency."[21] Garcetti itself, like the Court's other public employee speech cases, recognizes the state's very limited power as

---

[19] ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 1110 (3d ed. 2006); see also Waters v. Churchill, 511 U.S. 661, 668 (1994) (plurality opinion); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 284 (1977); Pickering, 391 U.S. at 568.

[20] See Waters, 511 U.S. at 671-72 ("[T]he government as employer indeed has far broader powers than does the government as sovereign." (citing Connick v. Myers, 461 U.S. 138, 147 (1983); Civil Serv. Comm'n v. Letter Carriers, 413 U.S. 548, 564 (1973); Pickering, 391 U.S. at 568)); see also Garcetti, 547 U.S. at 418 (citing Waters, 511 U.S. at 671).

[21] Waters, 511 U.S. at 675 ("The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate."); see also id. at 674-75 ("Rather, the extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the governor may, in the example given above, fire the deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.").

10

sovereign to infringe on First Amendment freedoms.[22] None of the Supreme Court's public employee speech decisions qualifies or limits the First Amendment's protection of elected government officials' speech.[23] Contrary to the district court's reasoning, there is a meaningful distinction between the First Amendment's protection of public employees' speech and other speech, including that of elected government officials.

Indeed, the Supreme Court's decisions demonstrate that the First Amendment's protection of elected officials' speech is robust and no less

---

[22] See Garcetti, 547 U.S. at 418 ("[T]he government as employer indeed has far broader powers than does the government as sovereign." (quoting Waters, 511 U.S. at 671)); id. ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations"); see also authorities cited supra note 19.

[23] Garcetti did not expand the scope of the public employee speech limitations to include elected officials; rather, Garcetti merely carved out a narrow exception to the Supreme Court's holdings that a government employer may not discipline or adversely affect public employees for their speech involving matters of public concern unless the state can prove that the needs of the government outweigh the speech rights of the employee. In Garcetti, Ceballos, a deputy district attorney, alleged that he had been subjected to adverse employment actions in retaliation for engaging in protected speech, viz., for writing an internal memo recommending the dismissal of a criminal case on the basis of alleged governmental misconduct. See Garcetti, 547 U.S. at 414-15. The Supreme Court concluded that Ceballos's speech was not protected, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421. Thus, the Court reasoned that when Ceballos spoke pursuant to his official duty he was not speaking as a citizen on a matter of public concern, and, therefore, his speech was not protected by the First Amendment. See id. at 423; see also The Supreme Court, 2005 Term, 120 Harv. L. Rev. 273 (2006). As a result, Garcetti created an exception allowing that, where a public employee speaks pursuant to official duty, the state may restrict this speech without proving that its management needs outweigh the employee's freedom of expression. See Garcetti, 547 U.S. at 423.

While Garcetti added a new qualification of public employees' freedom of expression recognized by the Court's long line of cases concerning public employee speech rights, it did nothing to diminish the First Amendment protection of speech restricted by the government acting as a sovereign rather than as an employer and did nothing to impact the speech rights of elected officials whose speech rights are not subject to employer supervision or discipline.

strenuous than that afforded to the speech of citizens in general. For example, in the 1960s the Court held in Bond v. Floyd, 385 U.S. 116, 133-35 (1966), that state action excluding a state representative from membership in the legislature because of his statements criticizing the policy of the federal government in Vietnam and the operation of the selective service laws violated his right of free expression under the First Amendment. In Wood v. Georgia, 370 U.S. 375, 392, 395 (1962), the Court held that out-of-court statements by a sheriff questioning the advisability of a grand jury investigation into block voting by black citizens did not present a clear and present danger to the administration of justice, and, therefore, the use of the contempt power to punish the sheriff for the statements abridged his right of free speech. The Court emphasized that "[t]he role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." Id. at 395.

Recently, in Republican Party of Minnesota v. White, 536 U.S. 765, 774-75 (2002), the Court held that a state supreme court's canon of conduct, which prohibited candidates for judicial election from announcing their views on disputed legal or political issues, is a content-based regulation of speech; that the proper test to be applied to determine the constitutionality of such a restriction is the strict scrutiny test; that the strict scrutiny test requires that the party defending the content-based restriction has the burden to prove that the regulation is (1) narrowly tailored to serve (2) a compelling state interest; and that in order for that party to show that the speech regulation is narrowly tailored, that party must demonstrate that the regulation does not unnecessarily circumscribe protected expression. See id. In White, based on the record

compiled in the district court on cross motions for summary judgment and the court of appeals' decision, a majority of the Supreme Court agreed that the parties defending the speech regulation had failed to carry their burden of proving that it was narrowly tailored to serve a compelling state interest, and that the state's prohibition on judicial candidates' announcing their legal views was an unconstitutional abridgement of freedom of speech. See id. Further, the Court reaffirmed that "'[t]he role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.'" Id. at 781-82 (quoting Wood v. Georgia, 370 U.S. at 395).[24]

Most significantly, this court in Jenevein v. Willing, 493 F.3d 551 (5th Cir. 2007), held that White, 536 U.S. at 765, required us to apply the strict scrutiny test to determine whether a state judiciary commission's order censuring an elected judge's speech on the basis of its content violated his First Amendment protected speech rights.[25] See Jenevein, 493 F.3d at 557-58. The censure order,

---

[24] Even before White, however, as evinced by the two principal decisions upon which it relied, the Court had vigorously applied the First Amendment protections through the strict scrutiny test on behalf of elected officials, candidates for elective offices, and political parties. See Eu v. S. F. County Democratic Cent. Comm., 489 U.S. 214, 222 (1989); Brown v. Hartlage, 456 U.S. 45, 53-54, 58 (1982).

[25] Jenevein's application of strict scrutiny, in reliance on White, is consistent with the Supreme Court's use of that formula to protect the expressive activity of virtually all persons from unnecessary content-based regulation of speech regarding public matters or governmental affairs. See, e.g., Consol. Edison Co. of New York, Inc. v. Public Svc. Com'n, 447 U.S. 530, 534-35 (1980) ("This Court has emphasized that the First Amendment embraces at the least the liberty to discuss publicly and truthfully all matters of public concern" (internal quotation marks omitted)). In fact, the strict scrutiny test originated in the First Amendment cases of the 1950s and 1960s before it was adopted in the equal protection cases regarding voting rights and racial discrimination, with which it is most identified now. See generally Siegel, supra note 12, at 361-381. Throughout the standard's history, the Court has applied the content-based strict scrutiny test in service of the "practically universal agreement that a major purpose of

which disciplined the judge for holding a press conference in which he addressed alleged abuses of the judicial process by lawyers in a pending case, shut down all communication between the elected judge and his constituents. See id. at 556-558. Applying the strict scrutiny test prescribed by White, we held that the censure order, in substantial part, was an unconstitutional content-based restriction of the elected official's speech because the state had failed to prove that it was narrowly tailored to further a compelling state interest. See Jenevein, 493 F.3d at 559-560.[26]

In Jenevein, we expressly declined the parties' invitation to draw upon the "Pickering - Garcetti line of cases for sorting the free speech rights of employees

---

[the First] Amendment [is] to protect the free discussion of governmental affairs," Mills v. Alabama, 384 U.S. 214, 218 (1966), and "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual," First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 777 (1978), by protecting the speech by a wide variety of citizens seeking to speak on matters of public concern. See, e.g., Texas v. Johnson, 491 U.S. 397 (1989) (protecting protesters wishing to burn the American flag); Boos, 485 U.S. at 321 (protecting individuals wishing to carry signs critical of foreign governments); Consol. Edison, 447 U.S. at 530 (protecting a public utility company wishing to include in billing envelopes pamphlets discussing controversial issues). Thus, our application of strict scrutiny, in Jenevein and here, to content-based restrictions on elected officials' speech regarding matters of public business and concerns fits squarely within the long-held principles of First Amendment jurisprudence.

[26] In Jenevein, 493 F.3d at 557-58, we applied strict scrutiny to analyze restrictions on an elected judge's speech despite a prior circuit precedent, decided before White, 536 U.S. at 781-82, that analyzed similar restrictions on an elected justice of the peace's speech under the Pickering balancing test, see Scott v. Flowers, 910 F.2d 201, 211-12 (5th Cir. 1990). To the extent that allegiance to the intervening Supreme Court decision in Republican Party causes Jenevein to conflict with prior circuit precedent in Scott, we are bound to follow the Supreme Court and apply Jenevein. See, e.g., United States v. Short, 181 F.3d 620, 624 (5th Cir. 1999) ("[T]his panel is bound by the precedent of previous panels absent an intervening Supreme Court case explicitly or implicitly overruling that prior precedent."). Further, Scott v. Flowers may be read as anticipating White because it noted that the state's interest in regulating elected officials' speech is "much weaker than in the typical public employee situation." Scott, 910 F.2d at 211.

elected to state office."[27] We noted that those cases' "categorical divisions of public and private speech fail to illuminate the state's interest in constraining speech by an elected public official, political speech at the core of the First Amendment, and its necessity."[28] Further, we noted that an elected official's relationship with the state differs from that of an ordinary state employee, observing "[o]ur 'employee' is an elected official, about whom the public is obliged to inform itself, and the 'employer' is the public itself, at least in the practical sense, with the power to hire and fire. It is true that [the elected official] was an employee of the state. It is equally true that as an elected holder of state office, his relationship with his employer differs from that of an ordinary state employee."[29]

## Conclusion

Applying the foregoing precepts, we conclude that the district court incorrectly assumed that the Pickering-Garcetti line of decisions, rather than the strict scrutiny test as elaborated in White, governs the present case. Accordingly, we reverse the district court's judgment and remand the case to it for the application of the strict scrutiny formula to Tex. Gov't Code § 551.144.[30]

---

[27] Jenevein, 493 F.3d at 558 (citing Pickering, 391 U.S. at 563; Garcetti, 547 U.S. at 410).

[28] Id. at 557 (citing White, 536 U.S. at 765).

[29] Id.; see also id at 558 ("If the State chooses to tap the energy and the legitimizing power of the democratic process [in the election of judges], it must accord the participants in that process . . . the First Amendment rights that attach to their roles.") (quoting White, 536 U.S. at 788).

[30] We note that the criminal provision in Tex. Gov't Code § 551.144 is the only portion of TOMA at issue in this case and that the district court's strict scrutiny inquiry should be

In doing so, we point out, however, that the Supreme Court has rejected "the notion that strict scrutiny is 'strict in theory, but fatal in fact.'"[31] The fact that strict scrutiny applies "'says nothing about the ultimate validity of any particular law; that determination is the job of the court applying'" that standard.[32]

---

limited to this provision.

[31] Adarand Constr'rs, Inc. v. Pena, 515 U.S. 200, 237 (1995) (quoting Fullilove v. Klutznick, 448 U.S. 448, 519 (1980) (Marshall, J., concurring)); see also Johnson v. California, 543 U.S. 499, 515 (2005) ("'The fact that strict scrutiny applies says nothing about the ultimate validity of any particular law . . . .'" (quoting Pena, 515 U.S. at 230)); Grutter v. Bollinger, 539 U.S. 306, 326 (2003) ("Strict scrutiny is not strict in theory, but fatal in fact." (internal quotation marks omitted)); United States v. Virginia, 518 U.S. 515, 533 n.6 (1996); Adam Winkler, Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts, 59 VAND. L. REV. 793, 795-96 (2006) (finding, based on an empirical study of "every strict scrutiny decision published by the district, circuit, and Supreme courts between 1990 and 2003," that "[c]ourts routinely uphold laws when applying strict scrutiny, and they do so in every major area of law in which they use the test. Overall, 30 percent of all applications of strict scrutiny — nearly one in three — result in the challenged law being upheld."); Siegel, supra note 12, at 394, 401 ("[S]trict scrutiny is a tool to determine whether there is a cost-benefit justification for governmental action that burdens interests for which the Constitution demands unusually high protection"); id. ("Tracing strict scrutiny's roots back to First Amendment narrow tailoring cases in the 1940s and compelling interest cases in the 1950s and early 1960s, establishes strict scrutiny as part of a constitutional paradigm in which, even for high-protectionist Justices, no constitutional right was 'beyond limitation,' and none could prevail over an appropriate subordinating governmental interest." (footnotes omitted)); Fallon, supra note 12, at 1302-03 (asserting that the Supreme Court has arguably adopted an interpretation of strict scrutiny as "a weighted balancing test, similar to European proportionality inquiries, in which a court must ask whether a particular intrusion on protected liberties, which may be greater or lesser, can be justified in light of its benefits." (footnotes omitted)).

[32] See Winkler, supra note 31, at 794 (quoting Pena, 515 U.S. at 230).
We emphasize that we remand this matter for the district court to conduct a strict scrutiny review in the first instance because that inquiry might well require development of the record beyond its present state, as the state has not yet been afforded an opportunity to prove that TOMA § 551.144 is narrowly tailored to further a compelling state interest. TOMA § 551.144 may indeed survive this strict scrutiny inquiry. Numerous states apparently employ similarly tailored provisions in their open meetings acts. See ANN TAYLOR SCHWING, OPEN MEETING LAWS 2d 275, 285 (2000). However, we simply lack the record necessary to make a

For these reasons, the judgment of the district court is reversed and the case is remanded to it for further proceedings consistent with this opinion.

---

strict scrutiny determination here; thus we remand the issue.