RECEIVED IN
COURT OF CRIMINAL APPEALS

October 22, 2015

ABEL ACOSTA, CLERK

PD-1067-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/21/2015 6:27:54 PM
Accepted 10/22/2015 8:09:20 AM
ABEL ACOSTA
CLERK

PD-1067-15

# In the Court of Criminal Appeals of Texas

---

## EX PARTE JAMES RICHARD "RICK" PERRY

---

On Petition for Discretionary Review from the District Court for the 390th Judicial District Travis County, Texas, Case No. D-1-DC-14-100139, and the Texas Court of Appeals for the Third District, at Austin, Case No. 03-15-00063-CR

---

**BRIEF OF CONSTITUTIONAL AND CRIMINAL LAW EXPERTS AS AMICI CURIAE IN SUPPORT OF THE APPLICATION FOR A WRIT OF HABEAS CORPUS**

---

Eugene Volokh
 California Bar No. 194464
Gary T. Schwartz Professor of Law
SCOTT & CYAN BANISTER
FIRST AMENDMENT CLINIC
UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Tel.: (310) 206-3926
*volokh@law.ucla.edu*

James C. Ho
 Texas Bar No. 24052766
Prerak Shah
 Texas Bar No. 24075053
Bradley G. Hubbard
 Texas Bar No. 24090174
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
Tel.: (214) 698-3264
Fax: (214) 571-2917
*jho@gibsondunn.com*
*pshah@gibsondunn.com*
*bhubbard@gibsondunn.com*

COUNSEL FOR AMICI CURIAE

TABLE OF CONTENTS

Page

Table of Authorities ................................................................................i

Statement of Interest of Amici ................................................................1

Introduction ............................................................................................5

Argument.................................................................................................7

I.     Count I of the Indictment Should Be Dismissed, Because It Is Both Unconstitutional and Barred by Legislative Immunity.................7

     A.     Count I Violates the Constitutional Doctrine of Separation of Powers, Because the Legislature Cannot Criminalize the Exercise of a Governor's Constitutional Veto Power..........................................................................7

     B.     Governor Perry Cannot Be Prosecuted for His Veto, Because He Is Entitled to Absolute Legislative Immunity for Any Exercise of His Veto Power. ......................................12

II.     Count II of the Indictment Should Be Dismissed, Because It Criminalizes Speech Protected by the First Amendment of the U.S. Constitution. ...............................................................................21

Conclusion .............................................................................................33

Certificate of Compliance ......................................................................35

Certificate of Service .............................................................................36

Page(s)

**Cases**

*Armadillo Bail Bonds v. State*,
802 S.W.2d 237 (Tex. Crim. App. 1990) ...............................................................8

*Bond v. Floyd*,
385 U.S. 116 (1966)...............................................................................................28

*Camacho v. Samaniego*,
954 S.W.2d 811 (Tex. App.—El Paso 1997, pet. denied)...................................14

*Clinton v. Jones*,
520 U.S. 681 (1997)...................................................................................... 17, 19

*D'Amato v. Superior Court*,
167 Cal. App. 4th 861 (Cal. Ct. App. 2008)...................................................15, 16

*Doe v. McMillan*,
412 U.S. 306 (1973)...............................................................................................15

*Dombrowski v. Eastland,*
387 U.S. 82 (1967)................................................................................................20

*Dublin v. State,*
742 N.E.2d 232 (Ohio Ct. App. 2000)...................................................................15

*Duncantell v. State,*
230 S.W.3d 835 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd)................27

*Ex Parte Gill*,
413 S.W.3d 425 (Tex. Crim. App. 2013) ...............................................................9

*Ex parte Perry*, No. 03-15-00063-CR, 2015 WL 4514696 (Tex.
App.—Austin July 24, 2015, pet. granted).........................................................6

*Forrester v. White*,
484 U.S. 219 (1988)...............................................................................................13

*Fulmore v. Lane*,
140 S.W. 405 (Tex. 1911)......................................................................................14

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)........................................................................................ 28, 29

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)................................................................32

*Hernandez v. City of Lafayette*,
643 F.2d 1188 (5th Cir. 1981) ...............................................14

*In re Perry*,
60 S.W.3d 857 (Tex. 2001)......................................... 12, 13, 14, 15, 20

*Irons v. R.I. Ethics Comm'n*,
973 A.2d 1124 (R.I. 2009)......................................................16

*Jenevein v. Willing*,
493 F.3d 551 (5th Cir. 2007) .................................................28

*Jessen Assocs., Inc. v. Bullock*,
531 S.W.2d 593 (Tex. 1975).....................................................14

*Jorgensen v. Blagojevich*,
811 N.E.2d 652 (Ill. 2004)......................................... 17, 18

*Langever v. Miller*,
76 S.W.2d 1025 (1934)............................................................8

*Meshell v. State*,
739 S.W.2d 246 (Tex. Crim. App. 1987) ...................................8

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968)................................................................28

*Pickle v. McCall*,
24 S.W. 265 (Tex. 1893)..........................................................14

*Rangra v. Brown*,
566 F.3d 515 (5th Cir. 2009) .................................................28

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015)............................................................29

*State v. Dankworth*,
672 P.2d 148 (Alaska Ct. App. 1983).....................................15

*State v. Hanson*,
  793 S.W.2d 270 (Tex. App.—Waco 1990, no writ)...............................22, 27, 32

*State v. Holton*,
  997 A.2d 828 (Md. Ct. Spec. App. 2010).................................................... 15, 19

*State v. Neufeld*,
  926 P.2d 1325 (Kan. 1996).......................................................................15

*Stockton v. Offenbach*,
  336 S.W.3d 610 (Tex. 2011)......................................................................11

*Tenney v. Brandhove*,
  341 U.S. 367 (1951)..................................................................... 13, 14, 16, 20

*United States v. Brewster*,
  408 U.S. 501 (1972)..................................................................................10

*United States v. Dowdy*,
  479 F.2d 213 (4th Cir. 1973) ....................................................................16

*United States v. Gillock*,
  445 U.S. 360 (1980)..................................................................................17

*United States v. Mandel*,
  415 F. Supp. 1025 (D. Md. 1976)..............................................................16

*United States v. Mandel*,
  415 F. Supp. 997 (D. Md. 1976)................................................................16

*United States v. Stevens*,
  559 U.S. 460 (2010)..................................................................................26

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008)..................................................................................26

*Watts v. United States*,
  394 U.S. 705 (1969)..................................................................................21

**Statutes**

TEX. PENAL CODE § 36.03(a)(1) ................................................................ 22, 29

TEX. PENAL CODE § 39.02(a)(2) .......................................................... 7, 9, 11, 15

## Constitutional Provisions

TEX. CONST. art. II, § 1 ..............................................................................8

TEX. CONST. art. III, § 21 .........................................................................12

TEX. CONST. art. IV, § 14 ...........................................................................7

U.S. CONST. art. I, § 6 ...............................................................................12

## Other Authorities

Alex Spilius & Jon Swaine, *Anthony Weiner Resigns over Lewd Twitter Photographs*, TELEGRAPH (U.K.), June 16, 2011....................................25

Andrew Ramonas, *Doggett: No Retreat on U.S. Attorney Picks*, MAIN JUSTICE (Oct. 13, 2009), available at http://www.mainjustice.com/ 2009/10/13/doggett-no-retreat-on-us-attorney-picks/ .........................31

Federalist No. 51 (Madison) .......................................................................20

*Hardball with Chris Matthews*, MSNBC, Sept. 5, 2007, transcript available at http://www.nbcnews.com/id/20623566/ns/msnbc-hardball_with_chris_matthews/t/hardball-chris-matthews-sept..........................24

*Lawmakers Decry Abuses Within Texas Youth Commission*, TEXAS SENATE NEWS, Feb. 27, 2007 ..................................................................24

Neil Munro, *Priebus: Obama Executive Amnesty Is A 'Nuclear Threat,'* THE DAILY CALLER (Nov. 7, 2014), available at http://dailycaller.com/ 2014/11/07/priebus-obama-executive-amnesty-is-a-nuclear-threat....................31

*Perry: Board to Resign*, WAXAHACHIE DAILY LIGHT, Mar. 15, 2007.....................24

*President Barack Obama, Remarks by the President in a Press Conference* (Nov. 5, 2014), available at http://www.whitehouse.gov /the-press-office/2014/11/05/remarks-president-press-conference ....................30

## STATEMENT OF INTEREST OF AMICI

Amici are an ideologically diverse coalition of experts in the fields of constitutional and criminal law—including former judges, solicitors general, prosecutors, criminal defense lawyers, constitutional litigators, and professors on both sides of the aisle. They represent virtually the entire political spectrum and have no personal or political stake in this case. They submit this brief for one simple reason: They are committed to the rule of law, and do not wish to see the law tarnished or distorted.

**Floyd Abrams** has served as counsel in many of the highest-profile First Amendment cases of the modern era, including representing *The New York Times* in the *Pentagon Papers* case. His most recent book is FRIEND OF THE COURT: ON THE FRONT LINES WITH THE FIRST AMENDMENT (2013).

**Michael Barone** is a Resident Fellow at the American Enterprise Institute and the principal co-author of THE ALMANAC OF AMERICAN POLITICS.

**Ashutosh Bhagwat** is a Professor of Law at UC Davis School of Law. He has published extensively on issues relating to freedom of expression.

**Jeff Blackburn** is the Founder and Chief Counsel of the Innocence Project of Texas, an organization dedicated to securing the release of those wrongfully convicted of crimes in Texas and educating the public about the causes and effects of wrongful convictions.

**Paul Coggins** is a former United States Attorney for the Northern District of Texas (1993-2001), appointed by President Bill Clinton.

**Alan Dershowitz** is the Felix Frankfurter Professor of Law, Emeritus, at Harvard Law School, and is one of the most well-known civil liberties advocates in the country.

**Raul A. Gonzalez** is a former Justice on the Texas Supreme Court (1984-1998), appointed by Governor Mark White and later elected as a Democrat.

**Stephen M. Griffin** is the W.R. Irby Chair and Rutledge C. Clement, Jr. Professor in Constitutional Law at Tulane University Law School. He has published numerous works on constitutional theory and history, including AMERICAN CONSTITUTIONALISM: FROM THEORY TO POLITICS (1996).

**James C. Ho** is a former Solicitor General of Texas (2008-2010) and a former Chief Counsel to the United States Senate Subcommittee on the Constitution (2003-2005).

**Daniel Lowenstein** is a Professor of Law, Emeritus, at UCLA School of Law. He is also the Director of the UCLA Center for the Liberal Arts and Free Institutions and a former chair of the California Fair Political Practices Commission, appointed by Governor Jerry Brown.

**Michael W. McConnell** is the Richard and Frances Mallery Professor of Law at Stanford Law School and the Executive Director of the Stanford

Constitutional Law Center. He is also a former Judge on the U.S. Court of Appeals for the Tenth Circuit (2002-2009).

**John T. Montford** is a former District Attorney for Lubbock County, a former Texas State Senator (D-Lubbock), and the first Chancellor of the Texas Tech University System.

**Michael Mukasey** is a former Attorney General of the United States (2007-2009) and a former judge on the U.S. District Court for the Southern District of New York (1987-2006).

**Theodore B. Olson** is a former Solicitor General of the United States (2001-2004) and a former Assistant Attorney General for the Office of Legal Counsel at the United States Department of Justice (1981-1984).

**Harriet O'Neill** is a former Justice on the Texas Supreme Court (1999-2010), a former Justice on the Fourteenth Court of Appeals of Texas (1995-1998), and a former Judge on the 152nd District Court of Texas (1993-1995).

**Nathaniel Persily** is the James B. McClatchy Professor of Law at Stanford Law School and served as the Senior Research Director for the Presidential Commission on Election Administration formed by President Barack Obama.

**Kenneth W. Starr** is a former Solicitor General of the United States (1989-1993) and a former Judge on the U.S. Court of Appeals for the D.C. Circuit (1983-1989).

**Johnny Sutton** is a former United States Attorney for the Western District of Texas (2001-2009), appointed by President George W. Bush, and a former Associate Deputy Attorney General at the United States Department of Justice.

**Eugene Volokh** is the Gary T. Schwartz Professor of Law at UCLA School of Law. He also runs UCLA's First Amendment Amicus Brief Clinic and is the author of THE FIRST AMENDMENT AND RELATED STATUTES (5th ed. 2013).[1]

---

[1] Amici's institutional affiliations are provided only for purposes of identification. No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici or their counsel made a monetary contribution to its preparation or submission. *See* TEX. R. APP. P. 11.

When he was governor, Rick Perry announced that he would exercise his constitutional authority to veto a bill if another political official did not do what he wanted. Then he vetoed that bill. For these two ordinary political acts, Governor Perry has been indicted on felony charges.

Both counts of the indictment are unconstitutional and must be dismissed immediately. The first count—which criminalizes Governor Perry's veto of a bill—violates the separation of powers enshrined in the Texas Constitution. The Legislature is not allowed to criminalize the exercise of powers that the Constitution specifically confers on the Governor, including the veto power.

And the second count—which criminalizes Governor Perry's threat to veto a bill if Travis County District Attorney Rosemary Lehmberg did not resign her office—violates the First Amendment of the U.S. Constitution and Article I, Section 8 of the Texas Constitution. Governor Perry "threatened" to perform a lawful act that the Texas Constitution specifically reserves to him (a veto) in order to encourage a public official to engage in a lawful act (a resignation). That is constitutionally protected speech.

The Third Court of Appeals in Austin correctly declared the statute in Count II to be facially unconstitutional. But the court of appeals erred in holding that Count I could proceed, concluding that it was bound by this Court's precedent to

not consider the challenges Governor Perry had levied against Count I at this point. *Ex parte Perry*, No. 03-15-00063-CR, 2015 WL 4514696, at *42 (Tex. App.—Austin July 24, 2015, pet. granted).

This Court should finish the job that the Third Court of Appeals started. It should affirm the Third Court's decision to declare the statute at issue in Count II facially unconstitutional and also declare the statute at issue in Count I to be unconstitutional as applied to the prosecution of Governor Perry.

* * *

We as amici take no position on the politics that led to this indictment. Reasonable people can disagree on the political tactics employed by both Governor Perry and his opponents. But to turn political disagreement into criminal prosecution is disturbing. To do so with an indictment riddled with constitutional infirmities is even worse.

The indictment of Governor Perry demands this Court's swift intervention. The writ of habeas corpus should be granted and this prosecution should come to an end.

**ARGUMENT**

**I.     Count I of the Indictment Should Be Dismissed, Because It Is Both Unconstitutional and Barred by Legislative Immunity.**

Count I of the indictment essentially alleges that Governor Perry violated Section 39.02(a)(2) of the Texas Penal Code when he vetoed a bill that would have funded the continued operation of the Public Integrity Unit of the Travis County District Attorney's office.  The prosecution alleges that Governor Perry exercised this veto "with intent to harm another"—namely, District Attorney Rosemary Lehmberg and the Public Integrity Unit.

But this Count suffers from two independently fatal flaws:  (1) the Legislature is not allowed to criminalize the Governor's exercise of his veto power, and (2) Governor Perry is entitled to absolute legislative immunity for any exercise of that veto power.

**A.     Count I Violates the Constitutional Doctrine of Separation of Powers, Because the Legislature Cannot Criminalize the Exercise of a Governor's Constitutional Veto Power.**

1.     The Texas Constitution vests in the Governor the absolute authority to veto appropriations bills.  *See* TEX. CONST. art. IV, § 14.  The Governor is entitled to decide which laws he "approv[es]" and which he disapproves—without any constraint from the Legislature, or from special prosecutors.  *Id*.

The Texas Constitution also includes an explicit separation of powers provision that sets forth the structure of Texas government:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

TEX. CONST. art. II, § 1.

This express provision "reflects a belief on the part of those who drafted and adopted our state constitution that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government." *Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex. Crim. App. 1990). "So important is this division of governmental power that it was provided for in the first section of the first article of the Constitution of the Republic of Texas, and alone it constituted article 2 of each succeeding Constitution." *Langever v. Miller*, 76 S.W.2d 1025, 1035 (Tex. 1934).

For these reasons, courts have long been vigilant about preventing any attempt by one branch of the government to encroach on the authority constitutionally secured to a different branch. Accordingly, "any attempt by one department of government to interfere with the powers of another is null and void." *Meshell v. State*, 739 S.W.2d 246, 252 (Tex. Crim. App. 1987). The separation of

8

powers provision is violated "when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers." *Ex Parte Gill*, 413 S.W.3d 425, 431-32 (Tex. Crim. App. 2013).

Yet the prosecution today claims that Section 39.02(a)(2) criminalizes Governor Perry's veto of an appropriations bill. If that were true, then the statute would be plainly unconstitutional. The Legislature cannot make it a crime for the Governor to veto appropriations bills, because that would obviously "interfere[]" with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers." *Id.* Any such outlawing of the use of the veto power would unilaterally increase the Legislature's own power, by eviscerating the Governor's power to veto legislation he does not "approve" of—even though, under the Texas Constitution, *every* legislative bill is subject to veto. The Legislature cannot enact a statute that constrains that gubernatorial power, thereby enlarging its own.

Nor would the analysis be different if Governor Perry vetoed a bill "with intent to harm another." The Texas Constitution places no limits on the Governor's exclusive power to decide which bills to give his "approval." So the Legislature cannot empower the Judiciary to pass judgment on the Governor's

9

intent behind a veto and accordingly chill the Governor's exercise of his veto power through the prospect of criminal punishment.

2. There are, of course, constitutional limits on the Governor's veto power. The Legislature can override a Governor's veto with a two-thirds vote. The Legislature can threaten not to enact laws that the Governor supports if he continues to exercise his veto in a manner with which it disagrees. The Legislature even has the power to impeach a Governor for a veto. And of course, the people of this State could always vote a Governor out of office because of a veto.

The Legislature can also criminalize acts of political corruption, such as the acceptance of a bribe in exchange for a veto. Notably, however, the illegal act in that circumstance is the acceptance of the bribe—*not* the veto itself. So a bribery prosecution would not trigger any of the separation of powers issues that plague this prosecution. *See, e.g., United States v. Brewster*, 408 U.S. 501, 526 (1972) ("There is no need for the Government to show that appellee fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise.").

None of these constitutionally permissible acts authorizes criminal prosecution for the Governor's exercise of his constitutionally prescribed veto power.

3.     It is not necessary to read Section 39.02(a)(2) in this clearly unconstitutional manner.  There is no indication that the Legislature intended for the statute to be so read.  This reading is the prosecution's own.  This Court can, and should, avoid this constitutional controversy entirely, by declaring that the statute simply does not criminalize Governor Perry's conduct.  As explained in further detail in the Governor's brief, a Governor simply does not have "custody or possession" of a sum of money that starts out in the Texas Treasury, ends up in the Texas Treasury, and remains throughout in the Texas Treasury.  Those funds are always in the custody of the Comptroller, not the Governor.

Not only would this be the most natural reading of the statutory text, but it would also avoid the constitutional infirmities raised by prosecuting Governor Perry for his veto.  *See, e.g., Stockton v. Offenbach*, 336 S.W.3d 610, 618 (Tex. 2011) ("We presume that when enacting legislation, the Legislature intends to comply with the state and federal constitutions, and we are obligated to avoid constitutional problems if possible.") (quotations and citation omitted).

* * *

The Constitution permits only two options:   either (1) read Section 39.02(a)(2) the way the prosecution does, and then declare the statute unconstitutional, because it violates the separation of powers doctrine decreed in the Texas Constitution; or (2) avoid the constitutional issue altogether, by

11

interpreting the statute not to apply to a Governor's veto of an appropriations bill. Either way, Count I must be dismissed.

**B.    Governor Perry Cannot Be Prosecuted for His Veto, Because He Is Entitled to Absolute Legislative Immunity for Any Exercise of His Veto Power.**

Count I also suffers from a separate yet equally fatal flaw: a Governor has absolute legislative immunity from any prosecution based on the exercise of his veto power.

1.    Legislative immunity is a common law doctrine that flows from the Speech or Debate Clauses of the Texas and U.S. Constitutions. *See In re Perry*, 60 S.W.3d 857, 859 (Tex. 2001) (citing U.S. CONST. art. I, § 6; TEX. CONST. art. III, § 21). It declares that "individuals acting in a legislative capacity are immune from liability for those actions." *Id*.

The reason for this immunity is simple. As the U.S. Supreme Court has explained, and the Texas Supreme Court has endorsed:

> "[T]he threat of liability can create perverse incentives that operate to *inhibit* officials in the proper performance of their duties. In many contexts, government officials are expected to make decisions that are impartial or imaginative, and that above all are informed by considerations other than the personal interests of the decisionmaker. Because government officials are engaged by definition in governing, their decisions will often have adverse effects on other persons. When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct."

*Id.* (alterations in original) (quoting *Forrester v. White*, 484 U.S. 219, 223 (1988)).

And for precisely those same reasons, the motivation behind a legislative act—be it partisan, personal, or parochial—is utterly irrelevant to the privilege of legislative immunity:

> The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.

*Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). *See also Perry*, 60 S.W.3d at 859-60 ("The legislative immunity doctrine recognizes that it is not consonant with our scheme of government for a court to inquire into the motives of legislators.") (quotations omitted).

2.     Notably, legislative immunity extends to any official who is acting in a legislative capacity, whether or not the official is a member of the Legislature. For example, the Texas Supreme Court has held that legislative immunity protects the Attorney General and the Comptroller (who are usually executive officials) when they perform "legislative functions" as members of the Legislative Redistricting Board. *Perry*, 60 S.W.3d at 860. "Courts have extended the legislative immunity doctrine beyond federal and state legislators to other

13

individuals performing legitimate legislative functions," such as mayors, city council vice-presidents, and others. *Id.* Indeed, "[a]ctions to which courts have extended absolute legislative immunity include a mayor's veto of an ordinance passed by a city council." *Camacho v. Samaniego*, 954 S.W.2d 811, 823 (Tex. App.—El Paso 1997, pet. denied) (citing *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1194 (5th Cir. 1981)). "[W]hen the mayor of a municipality vetoes an ordinance passed by the city's legislative body, he performs a legislative function and is entitled to absolute immunity from a civil suit complaining about actions taken in his legislative capacity." *Hernandez*, 643 F.2d at 1194.

Just as a mayoral veto is a legislative act subject to legislative immunity, so too is a gubernatorial veto. Texas law is clear that a gubernatorial veto is a legislative act, not an executive act. *See, e.g.*, *Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593, 598 (Tex. 1975); *Fulmore v. Lane*, 140 S.W. 405, 411 (Tex. 1911); *Pickle v. McCall*, 24 S.W. 265, 268 (Tex. 1893). Thus, Governor Perry is immune from liability for his veto.

This legislative immunity applies to criminal prosecutions as well as civil suits. Indeed, the core principle behind legislative immunity is to enable our "representatives to execute the functions of their office without fear of prosecutions, civil or *criminal*." *Tenney*, 341 U.S. at 373-74 (emphasis added). As courts have recognized, the "level of intimidation against a local legislator arising

14

from the threat of a criminal proceeding is at least as great as the threat from a civil suit," so "the privilege or immunity enjoyed by local legislators should be extended to criminal proceedings." *State v. Holton*, 997 A.2d 828, 845, 856 (Md. Ct. Spec. App. 2010), *aff'd*, 24 A.3d 678 (Md. 2011) (quotations omitted).[2]

So Count I presents a particularly straightforward application of legislative immunity. A conviction under Section 39.02(a)(2) requires an inquiry into Governor Perry's subjective state of mind. *See* TEX. PENAL CODE § 39.02(a)(2) (requiring "intent to harm"). But "it is not consonant with our scheme of government for a court to inquire into the motives of legislators." *Perry*, 60 S.W.3d at 859-60 (quotations omitted). "If the motives for a legislator's legislative activities are suspect, the constitution requires that the remedy be public exposure; if the suspicions are sustained, the sanction is to be administered either at the ballot box or in the legislature itself." *State v. Dankworth*, 672 P.2d 148, 152 (Alaska Ct. App. 1983). "The claim of an unworthy purpose does not destroy the privilege. . . .

---

[2] *See also Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) ("Congressmen . . . are immune from liability for their actions within the 'legislative sphere,' even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes.") (citation omitted); *D'Amato v. Superior Court*, 167 Cal. App. 4th 861, 871 (Cal. Ct. App. 2008) ("The district attorney . . . contends immunity applies only to civil suits, and does not extend to criminal prosecutions. We disagree."); *City of Dublin v. State*, 742 N.E.2d 232, 236 (Ohio Ct. App. 2000) ("'legislative privilege' embodies . . . substantive immunity from civil and criminal liability"); *State v. Neufeld*, 926 P.2d 1325, 1337 (Kan. 1996) ("[I]f a legislator's conduct falls within a legitimate legislative sphere, legality of the conduct is not a primary concern.").

15

In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies." *Tenney*, 341 U.S. at 377-78.[3]

3. The special prosecutor has previously argued that legislative immunity does not apply to a criminal prosecution of a Governor's exercise of the veto power, relying heavily on a single district judge's decisions in *United States v. Mandel*, 415 F. Supp. 997 (D. Md. 1976), and *United States v. Mandel*, 415 F. Supp. 1025 (D. Md. 1976). But that case is inapposite.

First, a crucial aspect of *Mandel* is not present here. There, the district judge reasoned that "the rationale for immunity from criminal prosecution is wholly lacking" when a prosecution comes from the executive branch. *Mandel*, 415 F. Supp. at 1031. As the judge explained, "[t]he executive has no reason to fear for its independence as a co-equal branch of government as a consequence of any criminal prosecution brought by itself." *Id.*

---

[3] *See also United States v. Dowdy*, 479 F.2d 213, 266 (4th Cir. 1973) ("Once it was determined, as here, that the legislative function . . . was *apparently* being performed, the propriety and the motivation for the action taken, as well as the detail of the acts performed, are immune from judicial inquiry."); *Irons v. R.I. Ethics Comm'n*, 973 A.2d 1124, 1131 (R.I. 2009) ("'[A]s long as [a legislator's] challenged actions, stripped of all considerations of intent and motive, were legislative in character, the doctrine of absolute legislative immunity protects them from such claims.'"); *D'Amato*, 167 Cal. App. 4th at 869 ("courts cannot inquire into the impetus or motive behind legislative action") (quotations omitted).

But the executive branch in Texas is not unitary. The Governor and the Attorney General are separately elected. Moreover, the power to bring criminal prosecutions in Texas is divided between the Attorney General and local district attorneys, with the bulk of the authority in the hands of district attorneys. So the chief executive of Texas *does* have reason to fear for his independence—as evidenced by this very case, he is subject to criminal prosecution brought by officials wholly outside of his authority.

Second, Governor Mandel was not entitled to legislative immunity in any event. *Mandel* concerned the *federal* prosecution of a *state* official. As the U.S. Supreme Court has made clear, legislative immunity does not apply in that context, because immunity derives from the separations of powers *within* a sovereign, not *between* sovereigns. *See United States v. Gillock*, 445 U.S. 360, 370 (1980). *Mandel* did not involve a state prosecution of a state official and is thus inapplicable to this case.

The special prosecutor has also cited *Jorgensen v. Blagojevich*, 811 N.E.2d 652 (Ill. 2004), and *Clinton v. Jones*, 520 U.S. 681 (1997), to argue that legislative immunity should not apply in this case. But neither of those cases even remotely supports that position.

*Jorgensen* involved a suit against a governor in his official capacity to declare an official act unconstitutional. It had nothing to do with holding a

17

governor personally liable, either civilly or criminally, for an official act. Obviously Governor Perry can be sued in his official capacity when a plaintiff is seeking to declare a government action unlawful. That happens all the time. But that has nothing to do with trying to hold him personally liable for a legislative act, as is the case here. Indeed, *Jorgensen* itself explicitly acknowledged this distinction:

> We note, moreover, that the Judges *have not sought to hold the Governor personally liable for his actions*, nor are they attempting to force him to take or to refrain from taking any particular action. He was named in the litigation because he was one of the state officials involved in the sequence of events which led to the failure of the Judges to receive their FY2004 COLAs. There is nothing unusual about his inclusion as a party. Examples of Illinois governors being joined as defendants in cases seeking *declaratory and injunctive relief* based on alleged violations of state constitutional and legal requirements are commonplace.

*Jorgensen*, 811 N.E.2d at 666 (emphasis added).

The special prosecutor curiously omitted this passage from his discussion of *Jorgensen* in the court below, even though it appears immediately before the passage that the special prosecutor chose to block quote. *See* Appellee's COA Br. 46-47. This omission is telling. After all, this passage shows that a governor *would* have legislative immunity if someone were seeking to hold him "personally liable for his actions," *id*.—as the special prosecutor is attempting to do here.

*Clinton* is not helpful to the special prosecutor either. The Supreme Court there said that immunity does not apply to *unofficial* conduct—but that it would

18

apply to *official* acts. As the Court explained, "[t]he principal rationale for affording certain public servants immunity from suits for money damages arising out of their official acts is inapplicable to unofficial conduct." *Clinton*, 520 U.S. at 692-93. Here, Governor Perry is being held criminally liable for an official act (a veto), not for any unofficial conduct, so he is entitled to immunity.

\* \* \*

Allowing Count I to proceed would utterly defeat the purpose of legislative immunity. Just like legislators, governors acting in their legislative capacity "must enjoy the same ability to speak and act in their legislative capacities, without fear of retribution, either criminally or civilly, because of what they say or how they vote." *Holton*, 997 A.2d at 856. Governors "may be called upon to answer for their legislative conduct to the citizens who elected them, which is what democracy is all about." *Id*. "[B]ut they may not be compelled to defend their legislative conduct to a prosecutor, to a grand jury or to a court." *Id*.

Indeed, as dangerous as the prosecution's theory originally was, it has become even more striking with the amended indictment and bill of particulars filed on February 13, 2015. Under the theory of that amended indictment, it is now a crime for the Governor to veto an appropriation—or for any government official to do any official act—for any purpose other than "for the sole benefit of the people of the State of Texas," such as "for the benefit of any private or individual

19

purpose, private business, political party, or other." So if a prosecutor decides that a government official did something even in part because it benefited the official's prospect of election to higher office, or improved the standing of the official's party, or just improved his reputation—anything at all other than solely benefiting the people of Texas—that is enough for a criminal prosecution.

This is far removed from the wisdom of the Framers, who recognized that politicians harbor personal ambitions as well as public-spiritedness; that "[a]mbition must be made to counteract ambition"; that "[t]he interest of the man" is an important aspect of defending "the constitutional rights" of his office; and that so long as men are not angels, the law must actually rely on "the private interest of every individual" officeholder, and not just on officeholders' "better motives," as an important part of our political system. Federalist No. 51 (Madison).

Moreover, it is important that Count I be dismissed *right now*—not after Governor Perry has stood trial. The whole point of legislative immunity is that it protects individuals from being put in jeopardy as a result of their legislative acts. That goal can only be achieved if legislative immunity can be asserted before trial. *See, e.g.*, *Perry*, 60 S.W.3d at 860 ("legislators 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves'" (quoting *Dombrowski v. Eastland,* 387 U.S. 82, 85 (1967)); *Tenney*,

20

341 U.S. at 372, 377 ("The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries . . . The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.").

## II. Count II of the Indictment Should Be Dismissed, Because It Criminalizes Speech Protected by the First Amendment of the U.S. Constitution.

Count II of the indictment alleges that Governor Perry violated the law by "threatening" to use his veto powers if a government official did not resign her post. But he has every right to do just that. Criminalizing Governor Perry's threat to veto legislation violates his right to freedom of speech under the Texas and U.S. Constitutions. This Count must also be dismissed, as the Third Court of Appeals correctly concluded.

1. A political official has the right to threaten to perform an official act in order to persuade another government official to engage in some other official act. That is not a crime—it is core political speech. *See, e.g., Watts v. United States*, 394 U.S. 705, 707 (1969) ("What is a threat must be distinguished from what is constitutionally protected speech.").

21

The Waco Court of Appeals said precisely that in a similar case twenty-five years ago. *See State v. Hanson*, 793 S.W.2d 270 (Tex. App.—Waco 1990, no writ). In that case, a county judge "was charged with having made a *threat* to take action as a public official in an attempt to *coerce* another public official into performing an official act." *Id*. at 272. Specifically, the defendant in *Hanson* threatened to terminate some of the county's funding in order to coerce a district judge to fire a county auditor and to coerce a county attorney to revoke an individual's probation. *Id*. at 271-72. Both the trial court and the court of appeals correctly dismissed the charges. As the court explained, in this sort of political context, "[c]oercion of a lawful act by a threat of lawful action is protected free expression." *Id*. at 272.

So too here. Governor Perry has been charged with attempting to "coerce" a lawful, official act (the voluntary resignation of a public official) by threatening to take a lawful, official act (the veto of an appropriations bill).[4] That is protected free expression, and the Governor cannot be prosecuted for it.

The prosecution has previously attempted to distinguish *Hanson* by suggesting that Governor Perry was acting unlawfully when he made his alleged

---

[4] We accept here for purposes of argument the special prosecutor's position that D.A. Lehmberg's resignation would have constituted an official act. But if leaving office is not an official act, then the elements of Section 36.03(a)(1) would not be satisfied, since that statute refers only to attempts to influence the exercise of "official power" or "official duty."

"threat," because he did not have the authority or control to request the resignation of D.A. Lehmberg. Appellee's COA Br. 25. But government officials are obviously allowed to use their powers to influence even those over whom they do not have direct supervision. A Senator may condition his vote for an appropriations bill on the resignation of a Cabinet Secretary, even though only the President can fire the Secretary. A President may threaten to veto a bill unless Senators agree to ratify a treaty, even though the President has no authority to directly mandate the signing of the treaty. There is nothing criminal about this sort of political hardball.

2. The consequences of allowing Governor Perry to be prosecuted under this law would be both far-reaching and devastating. The prosecution's theory of the case would criminalize a vast swath of constitutionally protected—and common—political speech. For example, it would make it illegal for:

- a legislator to tell the Governor, "if you appoint John Smith to this position, I won't vote for this law you want me to support";

- a Governor to tell a legislator, "if you don't amend this bill in a particular way, I'll veto it";

- a state legislator to tell a U.S. Senator, "if you vote for this federal bill, I'll vote against this state law that you like";

- a legislator to tell the Governor, "if you don't resign, I'll vote to impeach you"; or

23

- a government employee to tell his supervisor, "if you don't give me a raise, I'll ask for a transfer to a different department."

Nor need we limit ourselves to hypotheticals. Consider, for example, what happened during the Texas Youth Commission controversy in 2007. Countless state legislators across the political spectrum demanded the resignation of the commissioners—and threatened legislative action if they refused. "[Senator] Ogden said the Finance Committee is prepared to use the power of the purse to influence change at TYC . . . . He said significant changes will have to occur within TYC, enough for him to have confidence to recommend to his committee members that 'any appropriation' should go to the agency." *Lawmakers Decry Abuses Within Texas Youth Commission*, TEXAS SENATE NEWS, Feb. 27, 2007. *See also Perry: Board to Resign*, WAXAHACHIE DAILY LIGHT, Mar. 15, 2007 ("[At] a meeting of the joint committee charged with addressing problems at the TYC, lawmakers asked for the resignation of the board members, going so far as to pass a vote of no confidence against the board.").

Likewise, when U.S. Senator Larry Craig was arrested for indecent conduct in a public restroom, "Republican leaders embarrassed by Craig's behavior and news conference threatened to conduct hearings if Craig did not resign." *Hardball with Chris Matthews*, MSNBC (Sept. 5, 2007), transcript available at http://www.nbcnews.com/id/20623566/ns/msnbc-hardball_with_chris_matthews/t/ hardball-chris-matthews-sept.

And when it was revealed that U.S. Representative Anthony Weiner had sent sexually themed photographs of himself via Twitter, "his fate was sealed . . . when party leaders in Congress and President Barack Obama began vociferously calling for him to go and threatened to remove him from various committees."  Alex Spilius & Jon Swaine, *Anthony Weiner Resigns over Lewd Twitter Photographs*, TELEGRAPH (U.K.), June 16, 2011.

According to the prosecution in this case, it would have been a crime under Texas law for any of those officials to demand the resignation of other officials, and then to inform the other officials of potential retaliatory legislative actions if they refused.  That cannot be correct.  What the Texas legislators did in 2007, what the U.S. Senate Republican leadership did in 2007, and what the U.S. House Democratic leadership did in 2011 was neither criminal nor capable of being criminalized—it was protected political speech.

And so too here.  Just as Texas legislators were entitled to demand the resignation of the members of the Youth Commission, and just as members of Congress were entitled to demand the resignation of a Senator and a Representative who had disgraced their offices, Governor Perry was entitled to demand the resignation of an official who he felt was no longer serving the best interests of the Texans he was elected to represent—and to promise to use his

25

constitutionally prescribed veto power to achieve his goal. That is protected speech, and the State cannot criminalize any of it.

3. The vast amount of protected speech that would be deemed criminal under the prosecution's theory reveals another fundamental problem with this Count: the statute, as interpreted by the prosecution, is unconstitutionally overbroad and therefore facially invalid. Thus, even though Governor Perry engaged in constitutionally protected expression, in fact *no one* can be prosecuted under this statute.

A law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quotations omitted). And the possibility of prosecutorial discretion cannot save an overbroad statute. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). Here, the law—again, as interpreted by the prosecution—would plainly

capture an overwhelming amount of protected speech. It is accordingly unconstitutionally overbroad.[5]

The prosecution has argued that the statute is not overbroad because coercive threats are not entitled to First Amendment protection. Appellee's COA Br. 14 & nn. 30-32 (citing *Duncantell v. State*, 230 S.W.3d 835, 843-44 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd)). But threatening to engage in an official act in order to "coerce" someone to take an official act is not a punishable threat; it is protected political speech. *See Hanson*, 793 S.W.2d at 272.

And *Duncantell* provides no different. That case made the simple point that interfering with a police officer while he is on the street performing a law enforcement function is not expressive activity. *See Duncantell*, 230 S.W.3d at 844 (addressing interference with a "peace officer performing a duty imposed by law, such as investigating an accident or arresting a criminal suspect"). It does not mean that, for instance, a newspaper can be punished for harshly criticizing the

---

[5] The prosecution has argued that "if the court can identify any factual circumstance in which the statute is valid, the facial challenge must fail"—and accordingly provides hypothetical applications of the statute that it claims would not violate the First Amendment. Appellee's COA Br. 15-16. But that is the opposite of the overbreadth doctrine, which provides that a law must be *facially* struck down so long as a "substantial number"—not all—of its applications are unconstitutional. "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). The overbreadth doctrine is, in that sense, an exception to the traditional approach to facial challenge to statutes—an exception that the prosecution seems to have forgotten.

police, even when that interferes with officers' authority and thus makes it harder for them to perform their duties. It does not mean that a legislator can be punished for voting against a bill that would better fund police officers, because that too would make it harder for police officers to perform their duties. Likewise, it does not mean that a Governor can be punished for demanding the resignation of a D.A. simply because that would mean the D.A. would no longer be performing the duties of a D.A.

4. The prosecution has also argued that Governor Perry's speech is actually "government speech"—and thus any regulation of his speech is wholly exempt from First Amendment scrutiny. *See, e.g.*, Appellee's COA Br. 9-10 & nn. 11-18 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

But the speech of elected officials at issue here is simply not government speech as defined by the *Garcetti* line of cases.[6] Indeed, common sense demands that it not be government speech. Does the special prosecutor truly believe that the

---

[6] *See, e.g.*, *Jenevein v. Willing*, 493 F.3d 551, 558 (5th Cir. 2007) ("We are persuaded that the preferable course ought not draw directly upon the *Pickering-Garcetti* line of cases for sorting the free speech rights of employees elected to state office."); *Rangra v. Brown*, 566 F.3d 515, 523-24 (5th Cir. 2009) ("None of the Supreme Court's public employee speech decisions qualifies or limits the First Amendment's protection of elected government officials' speech."), *on reh'g en banc*, 576 F.3d 531 (5th Cir. 2009) (mooted). "The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 135-37 (1966).

Legislature could, with a veto-proof majority, prevent the Governor from saying *anything at all* on particular topics? Of course not—yet that is precisely what the Legislature could do if Governor Perry's speech were deemed government speech.

Moreover, even if this *Garcetti* argument is taken seriously, it is further undermined by the fact that Section 36.03(a)(1) is not limited to speech by elected officials. *See* TEX. PENAL CODE § 36.03(a)(1) ("*A person* commits an offense if . . .") (emphasis added). It would also apply to newspaper publishers, advocacy groups, and average citizens who make constitutionally protected statements in an attempt to influence legal acts (much as Governor Perry did here). Criminalizing such speech is plainly unconstitutional—and Section 36.03(a)(1) is thus unconstitutionally overbroad.

5. The prosecution has previously declared that "[t]he 'Coercion of a Public Servant' statute does not make the favored/disfavored expression distinction that would raise constitutional [content-discrimination] concern." Appellee's COA Br. 20. But the prosecution offers no explanation for this statement—which is unsurprising, because the statute is plainly content based. It specifically singles out speech that is intended to affect an act by a public official. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of," among other things, the "message expressed" in the speech or the "function or purpose" of the speech).

29

6. The prosecution has also oddly argued that the law is constitutional because "[w]here one public servant is threatened by another public servant . . . the possibility that the public servant speaker may assert First Amendment protection is precisely what makes the coercive threat so effective in seeking to influence the public servant listener." Appellee's COA Br. 8. The prosecution concluded that "[t]his precisely is the legitimate basis for courts allowing the State to regulate and put limits on a public servant's speech with greater latitude than regulating speech of a private citizen." *Id.*

But that cannot be right. Is the prosecution really arguing that if a public official has a First Amendment right to say something, the Legislature actually has a greater basis for regulating that speech? If anything, the opposite is true: the First Amendment is particularly crucial when the Legislature is trying to restrict protected political speech in an attempt to diminish its effectiveness.

\* \* \*

Last year, President Obama threatened to issue various executive orders if Congressional Republicans refused to pass comprehensive immigration reform. *See, e.g.*, President Barack Obama, *Remarks by the President in a Press Conference* (Nov. 5, 2014), transcript available at http://www.whitehouse.gov/the-press-office/2014/11/05/remarks-president-press-conference; Neil Munro, *Priebus: Obama Executive Amnesty Is A 'Nuclear Threat,'* THE DAILY CALLER (Nov. 7,

30

2014), available at http://dailycaller.com/2014/11/07/priebus-obama-executive-amnesty-is-a-nuclear-threat.

The President later followed through on that threat. To be sure, those executive actions are highly controversial and are currently the subject of litigation. But no one could seriously argue that President Obama's political statements regarding those actions are unprotected by the First Amendment and subject to potential criminal prosecution.

So too here. Just as President Obama can tell Congressional Republicans (as he did at an official White House press conference), "You send me a bill that I can sign, and those executive actions go away," Governor Perry can tell a convicted government official essentially the same thing: "You resign, and my veto goes away."

Moreover, if this prosecution is not *immediately* dismissed, the chilling effect on political discourse will be disastrous. Any public official who seeks to drive criminally or disgracefully behaving officials out of office will now rightly fear that a district attorney from the other side of the political spectrum would prosecute him—just as Governor Perry is being prosecuted here today.[7]

---

[7] *See, e.g.*, Andrew Ramonas, *Doggett: No Retreat on U.S. Attorney Picks*, MAIN JUSTICE (Oct. 13, 2009), available at http://www.mainjustice.com/2009/10/13/doggett-no-retreat-on-us-attorney-picks/ (quoting statement of U.S. Representative Lloyd Doggett recommending
[Footnote continued on next page]

31

If Governor Perry is forced to endure a criminal trial, then the damage will already be done—even if he is ultimately acquitted. The mere knowledge that an indictment can be maintained would itself chill a vast spectrum of constitutionally protected political speech by other political officials. *See Hanson*, 793 S.W.2d at 273 ("A vague statute that potentially could punish protected political debate violates due process because of its chilling effect on the exercise of that essential right.") (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

The special prosecutor has argued that there is no chilling effect, both because the statute has been on the books for decades and because no speech has been chilled since the start of Governor Perry's prosecution. Appellee's COA Br. 16-17. As to the first reason, of course the mere existence of the statute did not chill free speech. After all, until this special prosecutor came along, no one would have thought that they could be prosecuted for engaging in constitutionally protected political speech (as *Hanson* confirmed).

As to the second reason, the special prosecutor might actually be correct that Governor Perry's prosecution has not yet chilled any speech—but that is only because most people expect the case to promptly end because of its obvious constitutional flaws. But if it does not end immediately, that expectation will be

[Footnote continued from previous page]

"LULAC-supported Michael McCrum" for appointment as U.S. Attorney by President Obama).

32

shattered and the constitutional rights of public officials everywhere will be chilled.

That is why an immediate writ of habeas corpus is necessary in this case. This Court should announce—right now—that it is unconstitutional to prosecute Governor Perry for his protected political speech.

## CONCLUSION

The flaws in this indictment strike at the heart of the separation of powers doctrine enshrined in the Texas Constitution, as well as the freedoms protected by both the First Amendment of the U.S. Constitution and Article I, Section 8 of the Texas Constitution. So this prosecution must end immediately. The application for a writ of habeas corpus should be granted.

DATED:   October 21, 2015                    Respectfully submitted,


                                              /s/ *James C. Ho*

Eugene Volokh                                 James C. Ho
    California Bar No. 194464                     Texas Bar No. 24052766
Gary T. Schwartz Professor of Law             Prerak Shah
SCOTT & CYAN BANISTER                             Texas Bar No. 24075053
FIRST AMENDMENT CLINIC                        Bradley G. Hubbard
UCLA SCHOOL OF LAW                                Texas Bar No. 24090174
385 Charles E. Young Dr. East                 GIBSON, DUNN & CRUTCHER LLP
Los Angeles, CA 90095                         2100 McKinney Avenue, Suite 1100
Tel.:  (310) 206-3926                         Dallas, TX  75201-6912
*volokh@law.ucla.edu*                         Tel.:  (214) 698-3264
                                              Fax:  (214) 571-2917
                                              *jho@gibsondunn.com*
                                              *pshah@gibsondunn.com*
                                              *bhubbard@gibsondunn.com*


                    COUNSEL FOR AMICI CURIAE

34

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief satisfies the word-limit requirements for amicus briefs contained in the Texas Rules of Appellate Procedure, because it contains a total of 7,643 words, excluding the portions that can be excluded pursuant to those same rules.

/s/ *James C. Ho*
James C. Ho

## CERTIFICATE OF SERVICE

I hereby certify that, on October 21, 2015, a true and correct copy of the foregoing was served via electronic mail on the following counsel of record for all parties in this case:

Lisa C. McMinn
State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711

Michael McCrum
District Attorney Pro Tem
Travis County, Texas
700 N. St. Mary's St., Suite 1900
San Antonio, TX 78205

David M. Gonzalez
Assistant District Attorney Pro Tem
Travis County, Texas
206 East 9th Street, Suite 1511
Austin, TX 78701

*Counsel for the State of Texas*

David L. Botsford
BOTSFORD & ROARK
1307 West Avenue
Austin, TX 78701

Anthony G. Buzbee
THE BUZBEE LAW FIRM
JPMorgan Chase Tower
600 Travis Street, Suite 7300
Houston, TX 77002

Thomas R. Phillips
BAKER BOTTS LLP
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701

*Counsel for Applicant*

/s/ *James C. Ho*
James C. Ho